23-2427

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

❖ ❖ ❖

RANGE OF MOTION PRODUCTS, LLC,

*Plaintiff-Appellant,*

—v.—

ARMAID COMPANY INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE
JUDGE JON D. LEVY
1:22-CV-00091

## CORRECTED BRIEF FOR PLAINTIFF-APPELLANT

BRENDAN M. SHORTELL
DAVID J. CONNAUGHTON
JUSTIN P. TINGER
LAMBERT SHORTELL & CONNAUGHTON
100 Franklin Street
Boston, Maine 02110
(617) 720-0091

*Attorneys for Plaintiff-Appellant*

## <u>PATENT CLAIM AT ISSUE</u>

The claim of United States Design Patent No. US D802,155 S:

The ornamental design for a body massaging apparatus, as shown and described.

Appx37.

## **CERTIFICATE OF INTEREST**

Counsel for the Plaintiff-Appellant, Range of Motion Products, LLC, certifies the following:

1.  The Full Name of Party Represented by me:

Range of Motion Products, LLC


2.  Name of Real Party in interested represented by me:

None


3.  Parent corporations and any publicly held companies that own 10% or more of stock in the party:

None


4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case):

None

5. The title and number of any case known to counsel to be pending on this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47.4(a)(5):

None

6. Any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). *See* Fed. Cir. R. 47.4(a)(6):

None

# TABLE OF CONTENTS

PAGE

PATENT CLAIM AT ISSUE ........................................................... i

CERTIFICATE OF INTEREST ..................................................... ii

TABLE OF AUTHORITIES ........................................................vi

STATEMENT OF RELATED CASES ........................................1

JURISDICTIONAL STATEMENT ..............................................1

STATEMENT OF THE ISSUES ...................................................1

STATEMENT OF THE CASE .......................................................2

SUMMARY OF THE ARGUMENT ...........................................4

ARGUMENT ..................................................................................7

    I.   Standard of Review for Claim Construction ....................................7

    II.  The District Court Committed Multiple Legal Errors When Construing The D'155 Patent ...........................................................8

        A. The District Court Improperly Eliminates Entire Structural Elements From The Claimed Design .........................8

        B. Federal Circuit Precedent Has Established The Proper "Functional" v. "Ornamental" Analysis For Claim Construction ..........................................................................10

        C. The District Court Misinterpreted And Misapplied The Law Relating To Functionality To The Claim Construction ..........................................................................16

        D. The District Court's Construction Does Exactly What *Sport Dimension* Says Not To Do............................................19

        E. Relying On Extrinsic Evidence Over Intrinsic Evidence Is Improper ................................................................................21

PAGE

      F. Intrinsic Evidence Highlights Ornamental Features Of
         The  Claimed Design..................................................24

  III. Standard of Review for Summary Judgment..................29

  IV. When Properly Construed, The Patented And Accused
      Designs Are Similar.......................................................30

  V.  Even If Improperly Construed, The Patented And Accused
      Designs Are Similar.......................................................34

CONCLUSION AND RELIEF SOUGHT ..................................38

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# <u>TABLE OF AUTHORITIES</u>

PAGE(S)

## Cases

*Amgen Inc. v. Sandoz Inc.*,
  923 F.3d 1023 (Fed. Cir. 2019) ............................................. 29

*Amini Innovation Corp. v. Anthony California*,
  439 F.3d 1365 (Fed. Cir. 2006) ............................................. 30

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .......................................................... 34

*Avia Group International, Inc. v. L.A. Gear California, Inc.*,
  853 F.2d 1557 (Fed. Cir. 1988) ............................................. 12

*Crocs, Inc. v. Int'l Trade Comm'n*,
  598 F.3d 1294 (Fed. Cir. 2010) ............................................. 13

*Egyptian Goddess, Inc. v. SWISA Inc.*,
  543 F.3d 665  (Fed Cir. 2008)........................................*passim*

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*,
  796 F.3d 1312 (Fed. Cir. 2015) .....................................*passim*

*Garcia-Garcia v. Costco Wholesale Corp.*,
  878 F.3d 411 (1st Cir. 2017).................................................. 20

*L.A. Gear, Inc. v. Thom McAn Shoe Co.*,
  988 F.2d 1117 (Fed. Cir. 1993) ....................................... 12, 26

*Lanard Toys Limited v. Dolgencorp LLC*,
  958 F.3d 1337 (Fed. Cir. 2020) ..................................... 30, 31

*Lexion Med., LLC v. Northgate Techs., Inc.*,
  641 F.3d 1352 (Fed. Cir. 2011) ............................................. 29

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) ............................................... 22

*Netword, LLC v. Centraal Corp.*,
  242 F.3d 1347 (Fed. Cir. 2001) ............................................. 29

*Norton v. Rodrigues*,
  955 F.3d 176 (1st Cir. 2020)................................................ 29

PAGE(S)

*OddzOn Products, Inc. v. Just Toys, Inc.*,
122 F.3d 1396 (Fed. Cir. 1997) ................................... 11, 14

*PHG Techs., LLC v. St. John Cos., Inc.*,
496 F.3d 1361 (Fed. Cir. 2006) ........................................ 20

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (*en banc*)........................*passim*

*Puerto Rico American Ins. Co. v. Rivera-Vazquez*,
603 F.3d 125 (1st Cir. 2010)............................................. 29

*Range of Motion Products LLC v. Armaid Co.*,
2021 WL 3476607 (D. Me. 2021)............................... 3, 27, 34

*Richardson v. Stanley Works, Inc.*,
597 F.3d 1288 (Fed. Cir. 2010) .................................. 11, 14

*Rosco, Inc. v. Mirror Lite Co.*,
304 F.3d 1373 (Fed. Cir. 2002) ........................................ 26

*Sport Dimension, Inc. v. Coleman Co., Inc.*,
820 F.3d 1316 (Fed. Cir. 2016) .................................*passim*

*Talarico v. Marathon Shoe Co.*,
182 F. Supp. 2d 102 (D. Me. 2002)..................................... 29

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*,
135 S. Ct. 831 (2015) ..................................................... 7

## Statutes

28 U.S.C. §1295(a)(1) .................................................... 1

28 U.S.C. § 1331 .......................................................... 1

28 U.S.C. § 1338(a)....................................................... 1

28 U.S.C. §2107(a) ....................................................... 1

35 U.S.C. § 171(a) ....................................................... 11

## Rules

Fed. R. Civ. P. 56(a)..................................................... 29

## STATEMENT OF RELATED CASES

No appeal in or from the same proceeding in the lower court or body was previously before this or any other appellate court. Counsel for Range of Motion Products, LLC knows of no other case pending in this Court or any other court that may directly affect, or be directly affect by, this Court's decision in this appeal.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) and entered a final judgment on August 28, 2023. This timely appeal to the Federal Circuit was filed on September 14, 2023, as required by 28 U.S.C. §2107(a). This Court has jurisdiction under 28 U.S.C. §1295(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the District Court erred as a matter of law by eliminating entire structural elements from the patented design in construing the claim.

2. Whether the District Court erred as a matter of law by relying primarily on extrinsic evidence to contradict unambiguous intrinsic evidence in construing the claim.

3. Whether the District Court erred in granting summary judgment of noninfringement as a matter of law.

## STATEMENT OF THE CASE

This appeal is from a design patent infringement case filed in the District of Maine (Levy, J.) concerning U.S. Design Patent No. D802,155, titled "Body Massaging Apparatus." Appx37-Appx45 (the "D'155 Patent"). The D'155 Patent claims "the ornamental design for a body massaging apparatus" as shown in eight (8) exemplary figures. Appx37.

In early 2021, Plaintiff-Appellant, Range of Motion Products, LLC, a California limited liability company ("RoM"), filed its first complaint against Defendant-Appellee, Armaid Company Inc., a Maine Corporation ("Armaid"), for Armaid's unauthorized sales of a massage device called the "Armaid 2", which RoM believes infringes the D'155 Patent. RoM took this action to protect sales of its own massage device product, referred to as the "Rolflex". The Rolflex is the commercial embodiment of the D'155 Patent.

In 2016, Terry Cross ("Cross"), the President of Armaid, Brian Stahl ("Stahl"), the then and current CEO of RoM, and Nic Bartolotta, a physical therapist and mutual friend of both Cross and Stahl, formed RoM for the purpose of developing and selling the Rolflex. Despite also being the inventor, Cross assigned all his rights in the D'155 Patent to RoM when the application that would later become the patent was in its infancy. At the time, Armaid was selling a massage device, which will be referred to as the "Armaid 1" solely for clarity and conciseness.

The Armaid 1 and most of its structural features, particularly its two massaging arms, were functionally similar to analogous features on the Rolflex, but aesthetically looked very different.

In 2019, the personal and professional relationships between Cross and the other members of RoM broke down, and Cross, without relinquishing any of his ownership interest in RoM, began to focus his efforts on making Armaid a more successful company. Cross decided to do this by copying the design of the Rolflex, and, in late 2020, Armaid began selling a direct knockoff of the Rolflex's overall patented design, the Armaid 2.

Later, in 2021, shortly after RoM filed its first complaint against Armaid for design patent infringement, RoM filed a motion for a preliminary injunction, which was denied. In the District Court's opinion denying RoM's request, Judge Levy preliminarily and incorrectly construed the appearance of most of the utilitarian features shown in the D'155 Patent as "purely functional" and thus found it unlikely that the Armaid 2 would later be found to infringe the D'155 Patent. *Range of Motion Products LLC v. Armaid Co.,* 2021 WL 3476607, *7 (D. Me. 2021) ("*RoM 1*"). In a second case, filed after a stipulated dismissal without prejudice of *RoM 1*, Judge Levy issued an Order granting Armaid's motion for summary judgment. Appx1-Appx30 (the "Order"). The Order is the subject of this appeal.

In the Order, the District Court, again, erroneously construed most of the structural features illustrated in the D'155 Patent as purely functional and simultaneously found that the Armaid 2 did not infringe the ornamental appearance of the remaining structural features illustrated in the D'155 Patent. Contrary to well-established norms and cannons of design patent law, the District Court improperly excluded entire structural features from the scope of the claimed design, relied primarily on extrinsic evidence, and substituted its own judgment for that of a jury.

Accordingly, RoM now appeals the claim construction and non-infringement rulings in the District Court's Order.

**SUMMARY OF THE ARGUMENT**

RoM is appealing all aspects of the District Court's Order related to the legal issues of claim construction and non-infringement, decided as a matter of law.

Regarding claim construction, RoM asserts that Judge Levy's opinion on how to construe the scope of the D'155 Patent is legally erroneous because it: (1) improperly eliminates the appearance of entire structural features illustrated in the drawings from the claimed design; (2) relies primarily on extrinsic evidence when the intrinsic evidence is clear; and (3) as a result of these errors, it concludes that the design contained "many functional elements" and "minimal ornamentation," so the "scope of the claim is accordingly narrow." Appx21.

Specifically, the District Court, in its claim construction, entirely eliminates whole aspects of the claimed design, in particular the arms of the device, in direct opposition to Federal Circuit law. *Sport Dimension, Inc. v. Coleman Co., Inc.,* 820 F.3d 1316, 1321 (Fed. Cir. 2016) (rejecting a district court's claim construction because "it eliminates whole aspects of the claimed design"). Further, the District Court overlooks intrinsic evidence demonstrating that the arms are ornamental and relies primarily on a self-serving affidavit generated for the purposes of litigation, again, in direct contrast with this Court's claim construction precedent. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005) (*en banc*) (a court may consider extrinsic evidence "as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence."). Accordingly, affirming the District Court's claim construction would be a substantial departure from the law of *Sport Dimension*, *Phillips*, and related cases regarding functionality and claim construction. *Sport Dimension*, 820 F.3d at 1321 ("…in no case did we entirely eliminate a structural element from the claimed ornamental design…").

When properly construed, it is apparent that the patented and accused designs are at least similar, if not substantially similar, and thus, summary judgment of noninfringement was not appropriate. In fact, Judge Levy himself admits that the overall designs "look quite similar." Appx26. This should have been enough of a

reason to deny Armaid's motion outright; however, the District Court misconstrued the scope of the D'155 Patent leading to it erroneously granting Armaid's motion.

Moreover, even if the claim construction decided on summary judgment were somehow correct, there are still disputed material questions of fact that were improperly resolved by the District Court. For example, regardless of whether the claimed design is construed as "broad" or "narrow," whatever those terms mean, the D'155 Patent still claims a protectable design that must be compared to the Armaid 2 in light of the prior art. Such a comparison involves a highly fact-dependent analysis that was supposed to be reserved for a jury in this case. However, despite acknowledging the similarities between the appearance of the illustrations shown in the D'155 Patent and the Armaid 2, the District Court took this role away from the jury and decided noninfringement as a matter of law. Appx29.

Given the multiple legal errors in the Order on both claim construction and summary judgment, RoM respectfully requests this Court vacate both the District Court's claim construction determination and its summary judgment of non-infringement. Additionally, RoM requests that this Court construe the D'155 Patent's claim as "the appearance of the body massaging apparatus, as shown in Figs. 1-8, excluding only the material depicted in dashed lines" and remand the case with instructions on how a trier of fact is to apply the new construction. A total reversal of the Order is required to prevent manifest injustice.

# **ARGUMENT**

## **I.    Standard of Review for Claim Construction**

This Court reviews the ultimate claim construction of a design patent *de novo*. *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.,* 796 F.3d 1312, 1333 (Fed. Cir. 2015). When the district court reviews only intrinsic evidence during claim construction, "the judge's determination will amount solely to a determination of law, and the Court of Appeals will review that construction *de novo*." *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). However, any subsidiary factual findings based on the extrinsic evidence are "reviewed for clear error on appeal." *Teva*, 135 S. Ct. at 841.

A court can only consider extrinsic evidence "as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Phillips*, 415 F.3d at 1324 (*en banc*). In this case, the intrinsic evidence is unambiguous, so there was no need for the District Court to turn to extrinsic evidence. Therefore, although many subsidiary factual questions based on the extrinsic evidence were improperly resolved by the District Court during claim construction, the correct standard of review for this issue is *de novo*.

II. **The District Court Committed Multiple Legal Errors When Construing The D'155 Patent**

The District Court began its claim construction by immediately excising the appearance of the base from the scope of the claimed design, which unduly narrowed the scope of the claim before the differences between the patented design and the prior art were fully appreciated. Appx18. Next, after improperly beginning the claim construction analysis, the District Court continued to excise the appearance of whole structural features from the scope of the claim based on a legally incorrect application of this Court's precedent related to separating the "functional" and "ornamental" aspects of a claimed design. Appx18-Appx21. Finally, in reaching its ultimate claim construction, the District Court relied primarily on extrinsic evidence to contradict unambiguous intrinsic evidence. Appx19-Appx20.

A. **The District Court Improperly Eliminates Entire Structural Elements From The Claimed Design**

The District Court started its claim construction by ignoring all differences between the appearance of the bases in the patented design and the closest prior art. Appx18 ("disregarding distinctions among the bases, each of which serve a functional purposes outside the scope of a design patent"). Next, after improperly beginning its claim construction analysis, the District Court continued by primarily relying on extrinsic evidence to determine that the appearance of most of the

structural features for the body massaging apparatus shown in the patent drawings are "driven by function," and "thus, are beyond the scope of the claim in the D'155 patent." Appx20. In reaching this erroneous conclusion, the District Court relied solely on an expired utility patent for the prior art Armaid 1, a self-serving inventor affidavit from Cross, Armaid's President, and RoM's marketing materials for the Rolflex to excise the entire appearance of both the massaging apparatus's arms and base from the scope of the claimed design. Appx18-Appx20.

Based on the foregoing, apparent misunderstandings of Federal Circuit case law, Judge Levy determined that only "the hollowness and length of the handles, the thick ridged outline, the precise shape of the connector pivot, and the shape of the portion of the device where the hinge apparatus attaches to the fixed arm" constitute the claimed design, as only these features are purportedly "largely ornamental." Appx21 ("given the design's many functional elements and its minimal ornamentation, the overall…scope of the claim is accordingly narrow")(internal quotations omitted). This legally incorrect claim construction removed entire structural elements from the scope of the claimed design and, accordingly, must be vacated. *Ethicon*, 796 F.3d at 1332-34 (vacating a district court's claim construction that unduly narrowed the scope of a design patent claim to "cover 'nothing'"); *see also Sport Dimension*, 820 F.3d at 1321.

As RoM will now demonstrate, Judge Levy's excision of entire elements from the scope of the claimed design was legally erroneous, as was his near exclusive reliance on extrinsic evidence. *See Sport Dimension.,* 820 F.3d at 1321 (rejecting a district court's claim construction because "it eliminates whole aspects of the claimed design"); *see also Phillips,* 415 F.3d at 1312-19 (Fed. Cir. 2005) (explaining that unambiguous intrinsic evidence should not be contradicted by inferior extrinsic evidence). When properly construed, the D'155 Patent claims "the appearance of a body massaging apparatus, as shown in Figs. 1-8, excluding only the material depicted in dashed lines."

## B. Federal Circuit Precedent Has Established The Proper "Functional" v. "Ornamental" Analysis For Claim Construction

Since "a design is better represented by an illustration 'than it could be by any description'," courts should not attempt to make detailed verbal descriptions of design patents. *Egyptian Goddess,* 543 F.3d 665, 679-80 (Fed. Cir. 2008) (*en banc*). Rather, courts should use claim construction to help "guide the finder of fact by addressing a number of other issues that bear on the scope of the claim," including, but not limited to, "the role of particular conventions in design patent drafting, such as the role of broken lines," and "distinguishing between those features of the claimed design that are ornamental and those that are purely functional." *Egyptian Goddess*, 543 F.3d at 680.

When distinguishing between the ornamental and functional features of a claimed design, courts must understand that a design patent only protects the *appearance* of a product and does not extend to "the broader general design concept" of the functional features of the product shown in the drawings. *See OddzOn Products, Inc. v. Just Toys, Inc.,* 122 F.3d 1396, 1405 (Fed. Cir. 1997) (agreeing "with the district court's claim construction, which properly limits the scope of the patent to its overall ornamental visual impression, rather than to the broader general design concept of a rocket-like tossing ball"); *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1293-94 (Fed. Cir. 2010) (stating that the district court "properly factored out the functional aspects of [the claimed design]," which consisted of "several elements that are driven purely by utility," including, "the handle, the hammer-head, the jaw, and the crowbar" and properly limited the scope of the claim to the "ornamental aspects" of those utilitarian elements).

Properly separating the "functional" and "ornamental" aspects of a claimed design is admittedly confusing for both patent attorneys and judges alike, so, starting from the beginning - design patents protect articles of manufacture that necessarily have utilitarian features. To obtain a design patent, a person must "invent[] any new, original and ornamental design for an article of manufacture." 35 U.S.C. § 171(a). All articles of manufacture have features that are utilitarian; it is inherent in their nature. *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.,* 796 F.3d 1312, 1328 (Fed. Cir.

2015) ("Articles of manufacture necessarily serve a utilitarian purpose…"); *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123 (Fed. Cir. 1993)("An article of manufacture necessarily serves a utilitarian purpose…"). As aptly stated by this Court in *Avia Group International, Inc. v. L.A. Gear California, Inc.*:

> A distinction exists between the [de facto] functionality of an article or features thereof and the [de jure] functionality of the particular design of such article or features that perform a function. Were that not true, it would not be possible to obtain a design patent on a utilitarian article of manufacture, or to obtain design and utility patents on the same article.

853 F.2d 1557, 1563 (Fed. Cir. 1988). In other words, the presence of utilitarian features in a design cannot be a basis for invalidating or unduly narrowing the scope of a design patent, otherwise all design patents would be invalid or excessively narrow in scope.

Moreover, it is evident that all utilitarian features have an associated appearance and that particular appearance can be claimed in a design patent. Examples abound – personal flotation devices (*Sport Dimension*), construction tools *(Richardson)*, football toys (*OddzOn*), and surgical devices (*Ethicon*) – all have utilitarian attributes. Yet, these attributes also have an appearance, and it is only that appearance that is protected by a design patent in which those utilitarian features are part of the claim.

12

The overall appearance of all claimed features in a design patent – utilitarian or not – constitute the "ornamental design," and all claimed features must be considered when construing the claim's scope and determining infringement. *See, e.g., Sport Dimension*, 820 F.3d at 1321 (design patent claims are construed "to assist a finder of fact in distinguishing between functional and ornamental features. But in no case [do] we entirely eliminate a structural element from the claimed ornamental design, even though that element also serve[s] a functional purpose"); *Ethicon*, 796 F.3d at 1335 ("Where, as here, the claimed design includes several elements, the fact finder must . . . compar[e] similarities in overall designs, not similarities of ornamental features in isolation. An element-by-element comparison . . . is procedural error," citing *Richardson,* 597 at 1295; *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1303–04 (Fed. Cir. 2010)). In other words, even if a claimed design incorporates the appearance of purely utilitarian features, it does not prevent a competitor from using the exact same utilitarian features, as long as the overall appearance of the competitor's product does not look substantially the same as the patented design. *See Egyptian Goddess,* 543 F.3d at 678 (there is only infringement if, in the eyes of the "ordinary observer," the patented and accused designs are "substantially the same").

This Court has articulated the foregoing principles by explaining that design patents only protect a product's ornamental appearance, not its functional or

structural features described at a general, abstract level. *See, e.g., Richardson*, 597 F.3d at 1293-94; *OddzOn,* 122 F.3d at 1405. Moreover, this Court has taken care to clarify that when properly "factoring out" functional features, trial courts must not go so far as to exclude the visual impression or appearance of all features of the claimed design that have a function in the underlying product, as this would defeat the purpose of design patents. *See Ethicon,* 796 F.3d at 1328 ("the function of the article itself [de facto] must not be confused with [the de jure] 'functionality' of the design of the article")(internal quotations omitted).

Particularly, in *Sport Dimension*, this Court rejected the following claim construction from a district court:

> The ornamental design for a personal flotation device, as shown and described in Figures 1–8, *except the left and right armband, and the side torso tapering*, which are functional and not ornamental.

820 F.3d at 1321. The district court's logic in that case relied on this Court's guidance in *OddzOn, Richardson,* and *Ethicon*. However, this Court clarified that, in those cases, "we construed design patent claims so as to assist a finder of fact in distinguishing between functional and ornamental features. **But in no case did we entirely eliminate a structural element from the claimed ornamental design, even though that element also served a functional purpose**." *Id* (emphasis added). "By eliminating structural elements from the claim, the district court improperly converted the claim scope of the design patent from one that covers the overall

14

ornamentation to one that covers individual elements. Here, the district court erred by completely removing the armbands and side torso tapering from its construction." *Id* at 1322. As discussed below, this *Sport Dimension* claim construction is identical in structure to the District Court's present claim construction, which should be similarly vacated.

To evaluate functionality at claim construction, this Court has recently sanctioned district courts looking at the following factors:

> whether the protected design represents the best design; whether alternative designs would adversely affect the utility of the specified article; whether there are any concomitant utility patents; whether the advertising touts particular features of the design as having specific utility; and whether there are any elements in the design or an overall appearance clearly not dictated by function

*Sport Dimension*, 820 F.3d at 1322 ("Although we introduced these factors to assist courts in determining whether a claimed design was dictated by function and thus invalid, they may serve as a useful guide for claim construction functionality as well," citing *PHG Techs., LLC v. St. John Cos., Inc.*, 496 F.3d 1361, 1366 (Fed. Cir. 2006)). Notably, this Court has instructed district courts to consider "the availability of alternative designs as an important – if not dispositive – factor" in the inquiry. *Ethicon*, 796 F.3d at 1329-30. In short, the aforementioned "*PHG* factors" may *only* be considered if "the existence of alternative designs is not dispositive." *Id* at 1330

("where the existence of alternative designs is not dispositive…the district court may look to several other factors for its analysis").

While the availability of the alternative designs and/or the *PHG* factors may inform the claim construction analysis, this Court has clearly stated that it is legal error to use the *PHG* factors during claim construction to eliminate whole elements of the patented article from the scope of the claimed design. *Sport Dimension*, 820 F.3d at 1322 (agreeing that, in light of the *PHG* factors, "certain elements of [the claimed design] serve a useful purpose," but rejecting "the district court's ultimate claim construction" because it "eliminated the armbands and side torso tapering from the claim entirely, so its construction runs contrary to our law"). This is the exact legal error committed by the District Court in the present case.

## C. The District Court Misinterpreted And Misapplied The Law Relating To Functionality To The Claim Construction

In light of the foregoing, well-established principles, it is apparent that Judge Levy's approach when distinguishing the functional features from the ornamental features of the D'155 Patent was incorrect. *See* Appx18-Appx22. The ornamental features of the arms are substantial and not to be discounted. Starting from the beginning - the D'155 Patent claims "[t]he ornamental design for a body massaging apparatus," as shown in eight (8) design illustrations, reproduced below.

16



The functional or utilitarian features of the illustrated body massaging apparatus (i.e., the Rolflex) are best described as a base connected to the bottom of a hinge apparatus; two arms connected to the hinge apparatus, one fixed and one movable; both arms holding massage rollers; and two handles attached to the top of the arms. However, as a design patent, the D'155 Patent does not protect these functional features described at such a general, structural level – that is the realm of utility patents. Rather, the D'155 Patent only protects the "ornamental design" of these combined utilitarian features, which is simply the *overall appearance* or "ornamental design" of the massaging apparatus shown in the drawings.

Instead of engaging in this relatively straightforward analysis, which is clearly required by this Court's precedent, Judge Levy immediately turned to considering whether the appearance of each of the individual structural features shown in the D'155 Patent are driven by their function in order to cut various elements from the scope of the claim. Appx19 ("Considering [the *PHG* factors], it is evident that many, but not all, of the design features in the D'155 patent…are driven by function."). This mistaken analysis was compounded by the fact that Judge Levy began by considering the *PHG* factors without analyzing whether any evidence of alternative designs for the D'155 Patent was dispositive of the functional vs. ornamental inquiry.[1] Appx19.

Based solely on a *PHG* factor analysis, Judge Levy relied primarily on an expired utility patent for the prior art Armaid 1, a self-serving affidavit prepared solely for the purpose of this litigation by Armaid's President, Terry Cross, and RoM's marketing materials for the Rolflex, to opine that "many of the Rolflex's individual features have a functional purpose and, thus, are beyond the scope of the claim in the D'155 patent." Appx20. Judge Levy then identified "the hollowness and length of the handles, the thick ridged outline, the precise shape of the connector pivot, and the shape of the portion of the device where the hinge apparatus attaches

---

[1] RoM did point to evidence of at least one alternative design for the D'155 Patent/Rolflex, namely, the prior art Armaid 1, in its summary judgment opposition.

to the fixed arm," as the only "largely ornamental" features of the claimed design. Appx21. This was improper based on, among other cases, *Sport Dimension*. 820 F.3d at 1322.

### D. **The District Court's Construction Does Exactly What *Sport Dimension* Says Not To Do**

Judge Levy effectively construed the claim of the D'155 Patent as follows:

> The ornamental design for a body massaging apparatus, as shown and described in Figs. 1–8, *except the base and the two arms*, which are functional and not ornamental.

This claim construction is identical to the claim construction that this Court rejected in the *Sport Dimension* case, so affirming the District Court's present claim construction would be a departure from the precedent established in *Sport Dimension* as well as *OddzOn, Richardson,* and *Ethicon*. It would also be the first instance of this Court accepting a claim construction which entirely eliminates structural elements from the scope of the claim. *Id* at 1321. ("…in no case did we entirely eliminate a structural element from the claimed ornamental design…").

Recall that, in *Sport Dimension*, the district court improperly construed a design patent claim as:

> [t]he ornamental design for a personal flotation device, as shown and described in Figures 1–8, *except the left and right armband, and the side torso tapering*, which are functional and not ornamental. *Sport Dimension*, 820 F.3d at 1321.

19

Similar to the Judge Levy's logic regarding the base and the two arms in the present case, the lower court judge in *Sport Dimension* concluded that the "armbands and torso tapering" served a functional purpose because: (1) the patented design "represented the best available design for a personal flotation device"; (2) the patent owner "filed a co-pending utility patent disclosing the design patent's armbands and torso tapering and touting the utility of those features"; and (3) the patent owner also "promoted the particular utility of the armbands and tapered torso in its advertisements." *Id* at 1322. However, despite agreeing with these findings, this Court still held that the elimination of these functional elements from "the ultimate claim construction…runs contrary to our law." *Id*.

Thus, regardless of the results of an alternative design test or a *PHG* factor analysis, the District Court here necessarily erred as a matter of law by excluding the appearance of whole functional elements from the scope of the claimed design.[2] As this Court ruled in *Sport Dimension*, "[h]ere, as in *Ethicon*, the district court's construction of the Design Patents to have no scope whatsoever fails to account for

---

[2] Notably, "[w]hether a patented design is functional or ornamental is a question of fact." *PHG,* 469 F.3d at 1365 (Fed. Cir. 2006). By unnecessarily resolving factual questions related to the functionality of individual elements of the claimed design, the District Court resolved material, albeit subsidiary, questions of fact about the extrinsic evidence in favor of the movant, Armaid, on summary judgment. This is legally erroneous. *See Garcia-Garcia v. Costco Wholesale Corp.,* 878 F.3d 411, 417 (1st Cir. 2017) (on summary judgment the court must make all reasonable factual inferences in favor of the nonmovant).

the particular ornamentation of the claimed design and departs from our established legal framework for interpreting design patent claims." *Id* (citing *Ethicon*, 796 F.3d at 1334) (internal quotations omitted).

### E.  Relying On Extrinsic Evidence Over Intrinsic Evidence Is Improper

Apart from the improper excision of whole functional elements from the scope of the claimed design, another legal error contained in the District Court's claim construction ruling is its near exclusive reliance on extrinsic evidence to contradict the plain meaning of unambiguous intrinsic evidence. This led to an incorrect finding that the claimed arms are dictated by function. Instead, the intrinsic evidence shows that they are primarily ornamental. In two seminal cases, *Egyptian Goddess v. Swisa* and *Phillips v. AWH*, this Court set forth clear legal standards for construing design patent claims and the hierarchy of evidence to be considered during claim construction, respectively. In the present case, the District Court did not follow this well-established precedent.

In *Egyptian Goddess*, this Court held that formal claim construction is required in design patent cases, despite the potential difficulties involved in attempting to verbally construe drawings. *Egyptian Goddess,* 543 F.3d at 679. Since "a design is better represented by an illustration than it could be by any description," courts should not attempt to make detailed verbal descriptions of design patents. *Id*

(recognizing that "design patents are typically claimed as shown in drawings").

Rather, trial courts should use claim construction to help "guide the finder of fact by

addressing a number of other issues that bear on the scope of the claim," including,

but not limited to, "the role of particular conventions in design patent drafting, such

as the role of broken lines," and "distinguishing between those features of the

claimed design that are ornamental and those that are purely functional." *Id* at 680.

As previously discussed, while claim construction can distinguish ornamental and

functional features of the design as a whole, it is legal error to entirely eliminate the

appearance of individual structural components. *Sport Dimension*, 820 F.3d at 1322.

Now, while claim construction is a matter of law to be decided by a judge,

there are necessarily going to be certain pieces of evidence that are more useful than

others in helping the court determine the meaning of a claim. *Markman v. Westview*

*Instruments, Inc.*, 52 F.3d 967, 981 (Fed. Cir. 1995)(when "using certain extrinsic

evidence that the court finds helpful and rejecting other evidence as unhelpful…the

court is *not*…making factual evidentiary findings," and thus, "[t]he district court's

claim construction…is a matter of law subject to *de novo* review."). In *Phillips*, this

Court explained that intrinsic evidence is superior to extrinsic evidence for helping

guide a court's construction of a patent claim. *Phillips*, 415 F.3d at 1312-19.

Specifically, in a discussion of the hierarchy of evidence to be considered during

claim construction, *Phillips* states:

> In addition to consulting the specification, we have held that a court should also consider the patent's prosecution history, if it is in evidence… The prosecution history, which we have designated as part of the intrinsic evidence, consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent.

*Id* at 1317 (internal citations omitted). *Phillips* continues to highlight that extrinsic evidence, while permissible, is less reliable than the intrinsic record, and can suffer from bias:

> However, while extrinsic evidence 'can shed useful light on the relevant art,' we have explained that it is less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'… [E]xtrinsic evidence consisting of expert reports and testimony is generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence.

*Id* at 1317-18 (internal citations omitted).

In direct contradiction to this timeless guidance, the District Court's claim construction relied almost exclusively on biased extrinsic evidence to conclude functionality and then wrongly gave this evidence primacy over the specification, drawings, and prosecution history of the D'155 Patent.[3] Appx19-20. For example, Judge Levy relied on a self-serving, affidavit prepared by Cross, the President of

---

[3] The District Court committed this legal error despite being informed of the primacy of intrinsic evidence in a joint list of evidence to be considered during claim construction, which was prepared by the parties before oral argument. Appx54-Appx55. RoM also explicitly highlighted the importance of *Phillips* in a supplemental legal briefing after oral argument.

Armaid, to conclude that the "clamshell appearance of the arms" and the appearance of "the inverted mushroom base" are "driven by functional considerations."[4] Appx20. Similarly, the District Court relied on the Rolflex's marketing materials, which understandably highlight the device's overall functional attributes over its aesthetic appearance, to conclude that "many of the Rolflex's individual features have a functional purpose and, thus, are beyond the scope of the claim in the D'155 Patent." Appx20. In fact, Judge Levy went so far as to deride and chastise RoM for relying on intrinsic evidence during claim construction. Appx22 (stating "ROM has produced few – if any – facts that aid my analysis of which design features are functional. Instead, ROM relies largely on (1) the illustrations in the D'155 patent…").

## F. Intrinsic Evidence Highlights Ornamental Features Of The Claimed Design

As this Court will appreciate, the specification and drawings of the D'155 Patent provide unambiguous evidence for how to construe its claim. Starting with the claim language, the D'155 Patent protects "[t]he ornamental design for a body massaging apparatus, as shown and described." Appx37. The patent also expressly

---

[4] This Court will appreciate that if the appearance of a design is "driven by functional considerations," it is invalid. The District Court did not understand the implications of this language, as its claim construction eviscerates the scope of the D'155 Patent to essentially encompass nothing.

disclaims the appearance of the massage rollers from the scope of the claimed design by stating that the "[d]ashed lines indicate material disclaimed from the invention and are for purposes of illustration only." Appx37. Finally, the D'155 Patent also contains eight (8) drawings showing the claimed design from multiple different angles. Appx39-Appx45. Based on the foregoing, unambiguous intrinsic evidence, the D'155 Patent's claim should have been construed as: "The ornamental design for a body massaging apparatus, as shown in Figs. 1-8, excluding only the material depicted in dashed lines."

Even if the specification and claim from the D'155 Patent document were somehow unclear, other intrinsic evidence highlights the ornamentality of the design and it was still not permissible for the District Court to immediately turn to consideration of extrinsic evidence, like the self-serving Cross affidavit or the Rolflex's marketing materials. Rather, *Phillips* instructs turning next to the prosecution history, which "includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. To that end, the D'155 Patent cites as prior art U.S. Patent No. 5,792,081 to Cross. Appx31-Appx36 (the "'081 Patent"). The Armaid 1 was the commercial embodiment of the '081 Patent, and is also prior art to the D'155 Patent. As shown in the chart below, both the drawings of the '081 Patent and the appearance of the Armaid 1 are intrinsic evidence that provide clear examples of alternative designs for the D'155 Patent.

25

| Prior Art ('081 Patent) | Prior Art (Armaid1) | D'155 Patent (Fig. 3) |
|:---:|:---:|:---:|
|  |  |  |

This is strong evidence that the appearance of the overall claimed design and its individual features, particularly the arms, are not purely functional. *L.A. Gear, Inc. v. Thom McAn Shoe Co.,* 988 F.2d 1117, 1123 (Fed. Cir. 1993) (the availability of alternative designs is often the dispositive factor when determining non-functionality).

To be considered an alternative, a design "must simply provide the same or similar functional capabilities." *Ethicon*, 796 F.3d at 1330; *see Rosco, Inc. v. Mirror Lite Co.*, 304 F.3d 1373, 1378 (Fed. Cir. 2002) (an alternative design need not perform exactly the same function or be exactly as effective, it simply must have "similar functional capabilities"). Here, there is no question that one of the primary utilitarian features shared by all products at issue in this case is the two arms, which

may be squeezed by a patient to massage their own limbs with the attached rollers.[5]

*RoM 1,* 2021 WL at *5 (admitting that the '081 Patent "provides some insight into the basic functionality of all three devices…[f]or instances, the claims in the '081 patent include a device comprising two arms," and the '081 Patent's description "explains that the handles of each arm can be grabbed by the user's free hand and brought together."). Moreover, when comparing the drawings of the '081 Patent, the appearance of the Armaid 1, and the drawings of the D'155 Patent, it is readily apparent that the arms could appear very different while still being capable of performing the "same or similar function" as the Rolflex. In short, since the appearance of the arms claimed in the D'155 Patent are not the only way to achieve the self-controlled, leveraged massage function of the Rolflex, the claimed ornamental design for these features necessarily serves "primarily aesthetic, non-functional purposes." *See Ethicon*, 796 F.3d at 1332.

Instead of starting its functional v. ornamental analysis by recognizing the clear intrinsic evidence of alternative designs for the D'155 Patent, the District Court almost immediately turned to consideration of extrinsic evidence. While this might have been permissible, the conclusions that the District Court reached clearly contradict the unambiguous evidence found in the D'155 Patent and the prior art.

---

[5] This general functionality is described and claimed in the '081 Patent. Appx34-Appx36.

Specifically, Judge Levy relied primarily on the self-serving Cross affidavit and the Rolflex marketing materials to determine that "many of the Rolflex's individual features have a functional purpose and, thus, are beyond the scope of the claim in the D'155 patent." Appx20.

To be sure, Judge Levy has at least read the *Sport Dimension* decision and, therefore, denies that his claim construction excludes whole functional elements from the scope of the D'155 Patent's claim. Appx20-Appx21 (stating "[i]n reaching this conclusion, I do not wholly exclude functional features…"). This is merely handwaving. Judge Levy's opinion makes clear that he did not consider the appearance of the base and the two arms as part of the claimed design, despite the appearances of both utilitarian features being shown and claimed in the patent drawings. *See, e.g.,* Appx18 (disregarding distinctions among the three bases and asserting, without explicit evidence, that each base "serve[s] a functional purposes outside the scope of a design patent"); Appx26 (admitting that the D'155 Patent and the Armaid 2 "look quite similar," but "most of the Armaid2's similarities to the D'155 patent are likenesses to the latter's functional features. These functional features are not protected by the D'155 patent and, therefore, do not bear on the ordinary-observer test.").

### III.    **Standard of Review for Summary Judgment**

This Court reviews the grant of summary judgment of noninfringement under the law of the regional circuit. *Ethicon*, 796 F.3d at 1315; *Lexion Med., LLC v. Northgate Techs., Inc.,* 641 F.3d 1352, 1358 (Fed. Cir. 2011). The First Circuit reviews an order granting summary judgment *de novo*. *Norton v. Rodrigues*, 955 F.3d 176, 183 (1ˢᵗ Cir. 2020).

A grant of summary judgment is only proper if the movant has shown "there is no genuine dispute as to any material fact" and the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).    "When passing upon a motion for summary judgment, a district court must take the facts in the light most favorable to the nonmoving party, drawings all reasonable inferences therefrom to that party's behoof." *Puerto Rico American Ins. Co. v. Rivera-Vazquez,* 603 F.3d 125, 130 (1ˢᵗ Cir. 2010).

Patent infringement is a question of fact. *Amgen Inc. v. Sandoz Inc.*, 923 F.3d 1023, 1027 (Fed. Cir. 2019); *Talarico v. Marathon Shoe Co.*, 182 F. Supp. 2d 102, 106 (D. Me. 2002)(citing *Graver Tank & Manufacturing Co. v. Linde Air Products Co.,* 339 U.S. 605, 609 (1950)). To be entitled to summary judgement on the factual question of infringement, the movant must establish that, given proper construction of the patent, no reasonable jury could find infringement. *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1353 (Fed. Cir. 2001).

Particularly, in the context of design patents, this Court has only upheld summary judgments of noninfringement when the claimed design and the appearance of the accused product are "plainly dissimilar." *Ethicon*, 796 F.3d at 1336 (affirming a district court's grant of summary judgment of non-infringement only because the patented and accused designs were "plainly dissimilar"). As RoM will now demonstrate, the District Court committed legal error by summarily deciding noninfringement as a matter of law.

## IV. **When Properly Construed, The Patented And Accused Designs Are Similar**

When the D'155 Patent is construed properly, a reasonable jury could certainly return an infringement verdict at trial. Concluding that no reasonable jury could find infringement is a high bar indeed. *Amini Innovation Corp. v. Anthony California*, 439 F.3d 1365, 1371 (Fed. Cir. 2006) ("At the outset, this court perceives again that conclusions about reasonable jurors are difficult to make on an issue of this factual dimension."). The sole test for determining whether a design patent has been infringed is the "ordinary observer" test, which posits that a design patent is infringed by any product that looks "substantially similar" to the claimed design when viewed through the eyes of a hypothetical "ordinary observer" familiar with the prior art. *Lanard Toys Limited v. Dolgencorp LLC,* 958 F.3d 1337, 1343-44 (Fed. Cir. 2020); *Egyptian Goddess*, 543 F.3d at 678.

The "ordinary observer" is essentially the average consumer who is familiar with the prior art or previous products on the market and, thus, can compare similarities and differences between the patented design and the accused product in light of this knowledge. *See Lanard,* 958 F.3d at 1344 (stating that the "ordinary observer is deemed to view the differences between the patented design and the accused product in the context of the prior art"); *Egyptian Goddess*, 543 F.3d at 675 (stating that the "ordinary observer" is someone who, despite not being an expert, "is capable of assessing the similarity of the patented and accused designs in light of the similar objects in the prior art"). Importantly, the "ordinary observer" test requires the finder of fact to compare similarities of the *overall* designs in light of the prior art, not conduct an "element-by-element comparison." *See, e.g., Lanard*, 958 F.3d at 1343; *Ethicon*, 796 F.3d at 1335; *Egyptian Goddess*, 543 F.3d at 677.

An initial comparison of the D'155 Patent and the Armaid 2 reveals striking similarities. *See* Appx46 ("Infringement Contention"). The District Court admitted as much in both its first opinion in *RoM 1* and the Order. *RoM 1*, 2021 WL at *8 (stating "[t]here is no doubt that…the silhouettes and basic visual impressions of the D155 patent and the Armaid2 are similar"); Appx26 ("The D'155 patent and the Armaid 2 share a broad design concept and at a conceptual level they look quite similar"). A further comparison of the designs at multiple angles reveals that these designs are substantially similar, if not outright identical, depending on the viewing

angle. *See* Appx50-Appx52 ("Claim Chart"). However, the "ordinary observer" test ultimately requires a comparison of the patented and accused designs in the context of the prior art. Therefore, what follows is a chart comparing the D'155 Patent to the Armaid 2 in light of the closest prior art produced throughout this litigation, the Armaid 1.[6]

| Closest Prior Art (Armaid1) | D'155 Patent (Fig. 3) | Armaid2 (Side View) |
|---|---|---|
|  |  |  |

Pursuant to this Court's precedent, the ordinary observer will place more emphasis on the features of the D'155 Patent that are different in the Armaid 1. *Egyptian Goddess,* 543 F.3d at 676 (stating "[w]hen the differences between the claimed and accused design are viewed in light of the prior art, the attention of the

---

[6] To be sure, Armaid produced evidence of several other leveraged self-massage devices that were on the market before the Rolflex. However, a comparison between the D'155 Patent and the Armaid 2 in light of these references would only emphasize that the "ordinary observer" will not be very discerning – all of these products look completely different than the Rolflex, despite having similar leveraged, self-massaging functions.

hypothetical ordinary observer will be drawn to those aspects of the claimed design that *differ from the prior art*.") (emphasis added). Here, the primary differences between the D'155 Patent and the Armaid 1 are the particular shape of the two arms and the base.[7] The hinge apparatus, which is connected to the top of the base, and the portion of the fixed arm that connects to the hinge apparatus is very similar in both the D'155 Patent and the Armaid 1, so the ordinary observer will not be very discerning with regard to these particular features.

Now, comparing the features of the D'155 Patent that will stand out to the ordinary observer to the appearance of analogous features in the Armaid 2 – the two arms are identical, and the bases are slightly different. Whether or not the slight difference in the shape of the bases will be enough to prevent consumers from purchasing the Armaid 2 believing it to have the patented design is a material question of fact that should not have been resolved in Armaid's favor on summary judgment. If anything, the bases of the D'155 Patent and the Armaid 2 form only a small percentage of the overall designs, with the identical arms forming a much more significant portion of both designs.

When viewing this evidence in a light most favorable to RoM, the overall designs of the D'155 Patent and the Armaid 2 are substantially similar. Accordingly,

---

[7] The massage rollers also appear different; however, these are disclaimed in the D'155 Patent, so any similarities or differences between the three designs regarding these features are irrelevant to the infringement analysis.

summary judgment of noninfringement was improper. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986) (summary judgment should not be granted unless the factual questions are "so one-sided that one party must prevail as a matter of law").

## V.    Even If Improperly Construed, The Patented And Accused Designs Are Similar

At several points, the District Court has acknowledged the overall similarities between the D'155 Patent and the appearance of the Armaid 2. *See, e.g., RoM 1*, 2021 WL at *8 (stating "[t]here is no doubt that…the silhouettes and basic visual impressions of the D155 patent and the Armaid2 are similar"); Appx26 (admitting that the D'155 Patent and the Armaid 2 "look quite similar"). This alone should have been enough reason for RoM's case to survive summary judgment; however, Judge Levy improperly construed the scope of the D'155 Patent to entirely exclude the base and the two arms from the scope of the claim, and so concluded that the Armaid 2 was not infringing. Appx26 ("These functional features are not protected by the D'155 patent and, therefore, do not bear on the ordinary-observer test.").

Even if we suspend reality and assume *arguendo* that the District Court perfectly construed the D'155 Patent, summary judgment of noninfringement is still not appropriate. First off, it is hard to even determine what the District Court's construction is, let alone how to apply it. As best understood, the District Court's

construction for the patent is simply "narrow," whatever that means. Appx21 ("the overall…scope of the claim is accordingly *narrow*.") (emphasis added). This construction doesn't provide any useful guidance for a judge sitting as a finder of fact, let alone for a jury.

To be sure, the District Court's construction does identify specific features of the D'155 Patent that "appear to be largely ornamental." Appx21. These include the following:

> the hollowness and length of the handles, the thick ridged outline, the precise shape of the connector pivot, and the shape of the portion of the device where the hinge apparatus attaches to the fixed arm.

Appx21. Therefore, according to the District Court's position, the D'155 Patent at least claims the combined appearance of the foregoing features, which may be compared to analogous features in the Armaid 1 and Armaid 2 using the chart below. The "largely ornamental" features identified by the District Court are circled in red, for convenience.

| Closest Prior Art (Armaid1) | D'155 Patent (Fig. 3) | Armaid2 (Side View) |
|---|---|---|
|  |  |  |

Proceeding with the proper test for infringement, the ordinary observer will place more emphasis on the features of the D'155 Patent that are different in the Armaid 1. Under this hypothetical construction, the primary differences between the D'155 Patent and the Armaid 1 are simply the particular shape and the thick ridged outline of the handles. The shape of the portion of the device where the hinge apparatus attaches to the fixed arm and the precise shape of the connector pivot are practically identical in both the D'155 Patent and the Armaid 1, so the ordinary observer will not be very discerning with regard to these particular features.

Next, comparing the features of the D'155 Patent that will stand out to the ordinary observer to the appearance of analogous features in the Armaid 2 – the particular shape and the thick ridged outline of the handles are identical in the both

designs.[8] While the connection between the fixed arm and the hinge apparatus and the shape of the connector pivot are slightly different in the D'155 Patent and the Armaid 2, the ordinary observer will not be very discerning in regard to these particular features, and, instead, will focus primarily on the handles. Therefore, whether or not the slight differences between the designs will prevent a consumer from purchasing the Armaid 2 believing it to be the Rolflex is a material question of fact that should not have been resolved in Armaid's favor on summary judgment. If anything, the handles are identical, and, at least to the ordinary observer, the other claimed features are only slightly different, so the designs may even be substantially similar.

When viewing this hypothetical scenario in a light most favorable to RoM, the claimed design of the D'155 Patent and the appearance of analogous features on the Armaid 2 are similar, if not substantially so. Accordingly, even under the incorrect construction, summary judgment of noninfringement was still improper.

---

[8] The "thick ridged outline" on the handles of the D'155 Patent and Armaid 2 can best be seen in RoM's claim chart comparing the two designs. Appx50-Appx52.

## CONCLUSION AND RELIEF SOUGHT

Based at least on the foregoing, RoM respectfully requests that this Court vacate the District Court's claim construction ruling and construe the D'155 Patent's claim as "the appearance of the body massaging apparatus, as shown in Figs. 1-8, excluding only the material depicted in dashed lines." RoM also asks this Court to reverse the District Court's summary judgment of noninfringement and remand the case with instructions on how a finder of fact is to apply the proper claim construction.

Respectfully submitted,

/s/ Brendan M. Shortell
BRENDAN M. SHORTELL
DAVID J. CONNAUGHTON
JUSTIN P. TINGER
100 Franklin Street, Suite 903
Boston, MA 02110
(617) 720-0091

Dated: November 27, 2023                    *Attorneys for Appellant*

# ADDENDUM

# ADDENDUM
## TABLE OF CONTENTS

PAGE

Order on Defendant' s Motion for Summary Judgment,
    dated August 28, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Appx1

US 5,792,081 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Appx31

US D802,155 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Appx37

Plaintiff' s Infringement Contentions,
    dated November 18, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Appx46

RoM Claim Chart . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Appx50

Joint List of Proposed Claim Constructions
    and Citations to Evidence, dated January 31, 2023 . . . . . . . . . . . . . . .Appx53

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

RANGE OF MOTION        )
PRODUCTS LLC,           )
                         )
    Plaintiff,          )
                         )
        v.           )     No. 1:22-cv-00091-JDL
                         )
THE ARMAID COMPANY INC.,    )
                         )
    Defendant.       )

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Range of Motion Products, LLC ("ROM"), alleges that the Defendant, The Armaid Company Inc. ("Armaid"), markets and sells a body massaging product that infringes a design patent that ROM owns (ECF No. 1). This dispute is before me for the second time; in an earlier case, *Range of Motion Products LLC v. Armaid Co. Inc.* ("*Range of Motion I*"), No. 1:21-cv-00105-JDL, 2021 WL 3476607 (D. Me. Aug. 6, 2021), I denied ROM's request for a preliminary injunction which would have enjoined Armaid from marketing and selling the Armaid2, the accused product. Afterwards, the parties stipulated to the dismissal of *Range of Motion I* without prejudice.

ROM has filed a new Complaint raising infringement claims similar to those it alleged in *Range of Motion I* (ECF No. 1). Armaid now moves for summary judgment (ECF No. 42). For the reasons explained below, I grant Armaid's Motion for Summary Judgment.

1

**Appx1**

# I. BACKGROUND

A.    **Factual Background**[1]

Terry Cross, the Armaid Company's late owner, was a sports and occupational injury therapist who created a limb massaging apparatus, the Armaid1, in 1995. Cross designed the Armaid1 to relieve stress and muscle tightness in the arms. In 1998, Cross was awarded a utility patent (the "'081 patent"),[2] which was embodied in the Armaid1. The '081 patent—which has expired and is not at issue in this case— was summarized as "relat[ing] to body massaging devices and more particularly to devices adapted for the treatment of wrists and arms affected by carpal tunnel syndrome." ECF No. 43 at 2, ¶ 3 (alteration in original). Among the claims in the '081 patent is one for "a device comprising two arms, one of which is 'hingedly attach[ed]' to the other, with massaging members on each arm, and with arms that 'are shaped and dimensioned to adjustably clamp a limb between [the] . . . massaging members.'" ECF No. 43 at 3, ¶ 6 (alterations in original) (quoting ECF No. 43-4 at 4). The description in the '081 patent analogizes the hinge assembly to hinges used in adjustable pliers and notes that users can grab and hold together the device's handles with their free hand.

---

[1]  The parties stipulated that the summary judgment record would consist of the record from (1) this case, (2) *Range of Motion I,* and (3) related litigation in California state court between Stahl and Cross's Estate. *See* ECF No. 37 at 2, ¶ 3 (Court's report memorializing this stipulation).

[2]  *See* U.S. Patent No. 5,792,081.

*Image 1 - Side-by-side comparison of the '081 Patent and the Armaid1*

In 2015, Cross adapted the Armaid1 to create a device that massaged the entire body. Cross's adaptations included: (1) opening the end of the hinge apparatus to permit the therapy arm to be detached from the device; (2) molding the oval connector pivot directly into the end of the detachable therapy arm; (3) changing the base to be shaped like an inverted mushroom that would be stable wherever a user placed it on their body; and (4) increasing the curve of the arms to accommodate larger rollers as well as the user's legs.[3] The adapted device was ultimately known as the "Rolflex." ECF No. 43 at 4, ¶ 8.

---

[3] In general, I have adopted terms used in Armaid's uncontroverted statements of fact when describing the individual component parts of the various devices and patent illustrations central to this dispute. *See e.g.,* ECF No. 43 at 3-5, ¶¶ 9-11; 9-11, ¶¶ 27-28 and 32.

3

**Appx3**



*Image 2 - The original Rolflex*

In 2015, Cross filed two provisional applications for possible utility patents covering the functional features of the Rolflex.[4]  Neither application, which "described the invention embodied in the Rolflex in utilitarian terms," was approved.  ECF No. 43 at 5, ¶ 14.

In 2016, Cross, Nic Bartolotta, Brian Stahl, and an entity controlled by Stahl, formed ROM as a California limited liability corporation to sell the Rolflex.  Near that time, ROM's patent attorney filed an application[5] on behalf of ROM for a design patent that eventually resulted in the patent at issue in this case: U.S. Patent No. D802,155 S (the "D'155 patent").

---

[4]  I use the terms "feature" and "element" interchangeably throughout this order as shorthand for a component part of the devices and patent illustrations relevant to the infringement claim, as both terms are used to that effect in the caselaw underlying my analysis.  Relatedly, I use the term "aspect" to indicate the functional or ornament quality of a given feature/element.

[5]  Cross signed the application as the inventor and assigned his interest in the application to ROM on the same day.



*Image 3 - D'155 Patent*

The D'155 patent claims "[t]he ornamental design for a body massaging apparatus," as shown in eight illustrations (excepting material depicted by dashed lines).  ECF No. 43 at 1, ¶ 1 (alteration in original); *see infra* Part II(B)(1)(c) (D'155 patent illustrations).  The Rolflex "embod[ies] the design of the D'155 [p]atent," a point that ROM conceded in *Range of Motion I*.  No. 1:21-cv-00105-JDL, ECF No. 8 at 10.  ROM applied for a utility patent for the Rolflex, but this patent did not issue in part because it was deemed "obvious" in light of the '081 patent.

Later, after a falling-out with the other members of ROM, Cross concentrated his efforts on his Maine-based company, Armaid, and created the Armaid2, the accused product.



*Image 4 - The Armaid2*

The parties dispute the inspiration for Cross's development of the Armaid2. ROM contends that "Cross either came up with the Armaid2's design in light of the Rolflex or directly used the specifications for the molds of the Rolflex to create the Armaid2." ECF No. 47 at 4, ¶ 23. Armaid contends that the Armaid2 resulted from changes Cross made to the Armaid1 to improve its functionality based on customer feedback. The parties also dispute whether changes to the function or the form drove the Armaid2's development.

On June 1, 2021, Cross was awarded a utility patent (the "'310 patent") that protected at least one feature of the Armaid2 not present in the Rolflex. In the application for the '310 patent, Cross identified the invention as filling a need for a simple and effective self-operated body massaging apparatus that could be used from multiple angles without the risk of inflicting undue pain.

In late 2021, Cross died in an accident.

6

**Appx6**

**B.    Procedural History**

**1.  *Range of Motion I* Litigation**

ROM filed a Complaint in *Range of Motion I* on April 12, 2021, alleging that Armaid's manufacture and sale of the Armaid2 infringed the D'155 patent (No. 1:21-cv-00105-JDL, ECF No. 1).  ROM later moved for a preliminary injunction (No. 1:21-cv-00105-JDL, ECF No. 8).  After a hearing on the motion, I issued an Order denying ROM's request for a preliminary injunction because ROM had failed to show either a likelihood of success on the merits or that it had suffered an irreparable injury (No. 1:21-cv-00105-JDL, ECF No. 32).  *See Range of Motion I*, 2021 WL 3476607, at *13.  Subsequently, the parties stipulated to dismiss the action without prejudice, which ended the *Range of Motion I* litigation (No. 1:21-cv-00105, ECF No. 34).

**2.  Current Case**

ROM filed its current Complaint with this Court on April 8, 2022. (ECF No. 1). The Complaint does not differ meaningfully from the previous Complaint ROM filed in *Range of Motion I*.  The current Complaint requests: (1) a declaration that Armaid infringed the D'155 patent, (2) preliminary and permanent injunctions, (3) treble damages for willful misuse pursuant to 35 U.S.C.A. § 284 (West 2023), and (4) attorney fees. Armaid filed an Answer denying liability and raising several affirmative defenses (ECF No. 13).

On November 28, 2022, Armaid filed a Motion for Summary Judgment and Statement of Material Facts (ECF Nos. 42, 43).  The Statement of Material Facts includes ROM's infringement contentions (ECF No. 43-14) and claims chart (ECF No.

7

**Appx7**

43-15) as attachments. ROM responded in opposition on January 11, 2023 (ECF No. 46), and Armaid replied on January 22, 2023 (ECF No. 48). ROM was granted permission to file and, in fact, filed a Surreply (ECF Nos. 54, 56).

On January 31, 2023, the parties filed a chart delineating their respective constructions of the claims in the D'155 patent (ECF No. 52). They also filed briefs on various claim construction issues thereafter (ECF Nos. 57-60).[6] The parties disagreed about the need for a separate claim construction hearing on those issues: ROM favoring a limited hearing with arguments but no testimony, and Armaid altogether opposing a hearing because the D'155 patent's text and illustrations speak for themselves and, at any, rate, had already been analyzed in *Range of Motion I*. On March 30, 2023, I entered an Order noting that I would "discuss with counsel the need for the scheduling of a formal claim[] construction hearing at the hearing on the Motion for Summary Judgment scheduled April 26, 2023." ECF No. 62.

I heard oral argument on the Motion for Summary Judgment on April 26, 2023 (ECF No. 64), during which the parties also shared their respective views on the need for a separate hearing on claim construction.

## II. LEGAL ANALYSIS

### A.   Summary Judgment Standard

"A grant of summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[6] After Armaid (ECF No. 16) and ROM (ECF No. 23) requested alternatives to the original scheduling order (ECF No. 14), Magistrate Judge John C. Nivison amended the order to give the parties time to file claim construction briefs and, if requested and deemed necessary, for the Court to hold a hearing on the same (ECF No. 33).

8

law.'" *Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017)

(quoting *Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 68 (1st Cir. 2015)).

"A genuine issue of fact exists where 'the evidence is such that a reasonable jury could

return a verdict for the nonmoving party.'" *Id.* (quoting *Taylor v. Am. Chemistry

Council*, 576 F.3d 16, 24 (1st Cir. 2009)); *see also Feliciano-Muñoz v. Rebarber-Ocasio*,

970 F.3d 53, 62 (1st Cir. 2020) ("'An issue is "genuine" if it can "be resolved in favor

of either party," and a fact is "material" if it "has the potential of affecting the outcome

of the case."'" (quoting *Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 215 (1st Cir. 2016))).

To be entitled to summary judgment, the moving party "must 'affirmatively produce

evidence that negates an essential element of the non-moving party's claim,' or using

'evidentiary materials already on file . . . demonstrate that the non-moving party will

be unable to carry its burden of persuasion at trial.'" *Ocasio-Hernández v.

Fortuño-Burset*, 777 F.3d 1, 4-5 (1st Cir. 2015) (alteration in original) (quoting

*Carmona v. Toledo*, 215 F.3d 124, 132 (1st Cir. 2000)). "The court must examine 'the

record in the light most favorable to the nonmovant' and must make 'all reasonable

inferences in that party's favor.'" *Garcia-Garcia*, 878 F.3d at 417 (quoting *Ameen*,

777 F.3d at 68). However, the court "'must ignore conclusory allegations, improbable

inferences, and unsupported speculation.'" *Id.* (quoting *Taylor*, 576 F.3d at 24).

## B.    Design Patent Infringement Claim

Armaid seeks summary judgment on ROM's claim that Armaid infringed the

D'155 design patent by marketing and selling the Armaid2. Under 35 U.S.C.A. § 171

(West 2023), "[w]hoever invents any new, original and ornamental design for an

article of manufacture may obtain a patent therefor, subject to the conditions and

requirements of this title." Design patents protect only the "ornamental design of the article"—they "do not and cannot include claims to the structural or functional aspects of the article." *Lee v. Dayton-Hudson Corp.*, 838 F.2d 1186, 1188 (Fed. Cir. 1988); *see also KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1450 (Fed. Cir. 1993) ("A design patent protects the non-functional aspects of an ornamental design as shown in a patent.").

In patent infringement cases, "[s]ummary judgment is appropriate when it is apparent that only one conclusion as to infringement can be reached by a reasonable jury." *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002). "Summary judgment of noninfringement is also appropriate where the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, because such failure will render all other facts immaterial." *Id.*

Resolving a design patent infringement claim involves a two-step inquiry. "Determining whether a design patent claim has been infringed requires, first, as with utility patents, that the claim be properly construed to determine its meaning and scope. Second, the claim as properly construed must be compared to the accused design to determine whether there has been infringement." *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995) (citation omitted). The second step is known as the "ordinary observer" test. *Id.* Under this test, "infringement is found '[i]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other.'" *Lanard Toys Ltd. v. Dolgencorp LLC* ("*Lanard Toys II*"), 958 F.3d 1337, 1341

(Fed. Cir. 2020) (alteration in original) (quoting *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 670 (Fed. Cir. 2008) (en banc)).

### 1. Claim Construction

#### (a) Applicable Legal Standards

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Copan Italia S.p.A. v. Puritan Med. Prods. Co. LLC*, No. 1:18-cv-00218-JDL, 2019 WL 5699078, at *1 (D. Me. Nov. 4, 2019) (alteration in original) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005)). "The construction of patent claims is a question of law which is 'exclusively within the province of the court.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372, 384 (1996)). Trial courts have a "duty" to undertake claim construction in design patent cases. *Egyptian Goddess*, 543 F.3d at 679.

Design patents "'typically are claimed as shown in drawings.'" *Id.* (quoting *Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314, 1319 (Fed. Cir. 2007)). "In construing a design patent claim, the scope of the claimed design encompasses, 'its visual appearance as a whole,' and, in particular 'the visual impression it creates.'" *Lanard Toys, Ltd. v. Toys "R" Us-Delaware, Inc.* ("*Lanard Toys I*"), No. 3:15-cv-849-J-34PDB, 2019 WL 1304290, at *11 (M.D. Fla. Mar. 21, 2019) (quoting *Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed. Cir. 2002), *abrogated on other grounds by Egyptian Goddess*, 543 F.3d 665).

Trial courts are not required to provide a detailed verbal description of the claimed design. *Egyptian Goddess*, 543 F.3d at 679. Still, "a court may find it helpful to point out, either for a jury or in the case of a bench trial by way of describing the

**Appx11**

court's own analysis, various features of the claimed design as they relate to the accused design and the prior art." *Id.* at 680. And a trial court can "address[] a number of other issues that bear on the scope of the claim" including: (1) "describing the role of particular conventions in design patent drafting, such as the role of broken lines;" and (2) "assessing and describing the effect of any representations that may have been made in the course of the prosecution history;" and (3) "distinguishing between those features of the claimed design that are ornamental and those that are purely functional." *Id.* (citations omitted); *see also Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1333 (Fed. Cir. 2015) ("[T]here are a number of claim scope issues which may benefit from verbal or written guidance, among them the distinction between features of the claimed design that are ornamental and those that are purely functional.").

Distinguishing between functional and non-functional features of the claimed design is particularly illuminating. "Where a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent." *Sport Dimension, Inc. v. Coleman Co. Inc.*, 820 F.3d 1316, 1320 (Fed. Cir. 2016) (quoting *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997)). But a court should not "entirely eliminate a structural element from the claimed ornamental design, even though that element also served a functional purpose." *Id.* at 1321. The mere fact that a component of a product has a function does not mean that the component was designed solely based on functional considerations. *See Lifted Ltd., LLC v. Novelty Inc.*, No. 16-cv-03135-PAB-GPG, 2020 WL 2747814, at *3 (D. Colo.

12

**Appx12**

May 27, 2020) (acknowledging the distinction between "the functionality of the various components . . . and the functionality of the particular way those components are designed").

### (b) Need for a Separate Claim Construction Hearing

Before construing the D'155 patent, I address the threshold question of whether a separate claim construction hearing is needed. ROM argues that a separate hearing is necessary because claim construction involves legal and factual issues distinct from those relevant to deciding the underlying infringement claim. At the April 26, 2023, hearing, however, ROM acknowledged that the Court already had a "complete statement of the evidence that [it] should consider in deciding the claim construction" before it. Tr. at 24:1-5

Whether to hold a separate claim construction hearing is a decision within the Court's discretion. *See Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358 (Fed. Cir. 2001) (holding that district courts "need not follow any particular procedure in conducting claim construction"); *see also Revlon Consumer Prods. Corp. v. Estee Lauder Cos., Inc.*, No. 00 Civ. 5960 RMB AJP, 2003 WL 21751833, at *14 (S.D.N.Y. July 30, 2003) (recommended decision) ("Nothing . . . mandates the use of a [claim construction] hearing in every patent case."). Under the circumstances of this case, I conclude that a claim construction hearing is unnecessary for several reasons.

**Appx13**

First, as ROM conceded at oral argument, there is sufficient record evidence for me to construe the claim in the D'155 patent.[7] The parties submitted a claim construction chart with cited evidence that, as ROM acknowledges, I am entitled to rely upon. Indeed, in its request for a claim construction hearing, ROM notes that it would not seek to present testimony at the hearing. ECF No. 61 at 1. Second, the parties have had a full opportunity to brief claim construction in this case and discuss the issue at oral argument; more argument on the same evidence would not be helpful. Third, to the extent that ROM wishes to provide expert witness testimony at that hearing—as indicated in the parties' claims construction chart, albeit inconsistently with ROM's request for a limited hearing—the deadline to designate expert witnesses has long passed. Finally, I already had the benefit of an initial exchange of claim construction briefs in *Range of Motion I*, and the factual record here is nearly identical to the one in that case, with the addition of only a few documents.[8]

ROM's arguments to the contrary are not persuasive. ROM contends that claim construction in this instance presents a different legal posture than in *Range of Motion I* and, therefore, would benefit from additional argument. But ROM

---

[7] In any event, the record that could be created at such a claim construction hearing is likely limited by Cross's untimely death.

[8] As the parties acknowledge, I am not bound at the summary judgment stage by the claim construction that I conducted when ruling on ROM's Motion for a Preliminary Injunction in *Range of Motion I*. *See Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1302 (Fed. Cir. 2012) ("[T]he general rule is that tentative claim construction for preliminary injunction purposes does not remove the issue from later review after the facts are elaborated . . . ."). The Federal Circuit has implied that, under some circumstances, an initial claim construction can constitute binding "law of the case," *see id.* at 1301-02, but neither party raises that issue, so I decline to discuss it further.

already raised claim construction arguments in its briefs and at the summary judgment hearing. And ROM's prior indications that additional evidence bearing on claim construction could be submitted at such a hearing are at odds with the narrow scope of the hearing it is actually requesting. As noted, ROM expressly represented that I could rely on the existing evidence in the record to construe the claim in the D'155 patent. Moreover, ROM has failed to detail any additional evidence that would assist the Court with claim construction, or why ROM failed to include that evidence in the summary judgment record.[9]

Accordingly, because a hearing is discretionary and the record before the Court provides a sufficient basis to construe the design claimed in the D'155 patent, I deny ROM's request for a separate claim construction hearing.

---

[9] For example, ROM suggested at oral argument for the first time that it could adduce (1) the testimony of Bartolotta and (2) an email and photograph supporting their contention that Cross designed the Armaid2 from the molds used for the Rolflex. With respect to the latter, ROM did not explain how this evidence can help to elucidate the scope of the D'155 patent or which design features of the D'155 patent are driven by functional considerations.

Subsequent to the hearing, ROM filed a Motion for Leave to File Additional Evidence (ECF No. 65), wherein it sought to supplement the summary judgment record to include the email and photograph as additional support for denying Armaid's assertion that Cross modified the Armaid1 to create the Armaid2. ROM's motion argued that the additional evidence was relevant to the issue of whether Cross designed the Armaid2 based on the Armaid1 or the Rolflex:

> At the time of filing its opposition, RoM believed and still maintains that this denial is sufficient to create a dispute of material fact sufficient to survive a motion for summary judgment. However, to the extent that the Court believes this critically disputed fact is not properly supported by the evidence of record, RoM respectfully requests the opportunity to provide a single piece of additional evidence in support of Mr. Stahl's statements under Fed. R. Civ. P. Rule 56(e).

ROM's motion did not suggest that the additional evidence was submitted for purposes of claim construction. I denied ROM's motion because "ROM ha[d] previously supported its denial of the fact in dispute" by citing to the affidavit from Stahl. ECF No. 73 at 2. I did not decide whether the product Cross used as a starting point for developing the Armaid2 was material to the disposition of Armaid's Motion for Summary Judgment.

### (c) Construing the Claim in the D'155 Patent

The D'155 patent is entitled "Body Massaging Apparatus" and recites a claim for "[t]he ornamental design for a body massaging apparatus, as shown and described." ECF No. 52-1 at 2. The patent includes eight design illustrations, reproduced below, representing the apparatus as viewed from several perspectives.



*Images 5-12 - D'155 Patent Design Illustrations*

16

The portions of the illustrations depicted in dashed lines—*i.e.*, the massage rollers—are expressly disclaimed from the scope of the patent, so they do not contribute to its scope.

Considering the Federal Circuit's instructions in construing design patents, *see Egyptian Goddess*, 543 F.3d at 679-80, as well as the maxim that a picture is worth a thousand words, I rely on these design illustrations and do not write a detailed, feature-by-feature description to define the scope of the claimed design. I proceed by first comparing various features of the claimed design, the accused design, and the prior art, and later by addressing the functional-vs-ornamental analysis contemplated by *Egyptian Goddess*.

     (i)    **Comparing the Claimed Design, Accused Design, and Prior Art**



| D'155 Patent (The claimed design) | Armaid2 (The accused product) | Armaid1 (The prior art) |
|---|---|---|

*Image 13 - Side-by-side comparison of the D'155 Patent, the Armaid2, and the Armaid1.*

Several similarities among the designs of the D'155 patent (the claimed design), the accused product (the Armaid2), and the only potentially limiting prior

art (the Armaid1) bear noting.  As apparent from the side-by-side comparison above the D'155 patent is broadly similar to the Armaid1: both have opposable, curved arms, roller cutouts and handles, with the arms attached to a hinge apparatus with multiple slots for size adjustment.  But the three designs also vary considerably—most noticeably in the arms (disregarding distinctions among the bases, each of which serve functional purposes outside the scope of a design patent).  The arms in the D'155 patent and Armaid2 curve gradually whereas the Armaid1's arms pinch suddenly just below the handles.  Other distinctions among the three designs include (1) the connection between the hinge apparatus and the arm, particularly between the D'155 patent and the Armaid2; (2) the number of adjustment slots in the hinge apparatus; and (3) the shape of the roller cutouts.  And, as noted above, some of the changes between the D'155 and the Armaid1 resulted from the fact that the D'155 patent was developed to be used on the entire body, not just the arms.

### (ii)    Functional vs. Ornamental Analysis

"[D]istinguishing between those features of the claimed design that are ornamental and those that are purely functional" can be particularly helpful to the trier-of-fact because the scope of a design patent is limited to the ornamental aspects of a design. *Egyptian Goddess*, 543 F.3d at 680.  "[W]hile it may be appropriate to note particular functional features of a design, it is improper to wholly exclude structural elements of a design patent claim simply because they have functional aspects.  Instead, the Court should consider the manner in which the functional features of the design patent 'contribute to the overall ornamentation of the design.'" *Lifted Ltd.*, 2020 WL 2747814, at *2 (citation omitted) (quoting *Sport Dimension*, 820

18

**Appx18**

F.3d at 1323). Determining if a particular design choice is driven by function involves several related inquiries, namely:

> whether the protected design represents the best design; whether alternative designs would adversely affect the utility of the specified article; whether there are any concomitant utility patents; whether the advertising touts particular features of the design as having specific utility; and whether there are any elements in the design or an overall appearance clearly not dictated by function.

*Sport Dimension*, 820 F.3d at 1322 (quoting *PHG Techs., LLC v. St. John Cos., Inc.*, 496 F.3d 1361, 1366 (Fed. Cir. 2006)).

Considering these factors, it is evident that many, but not all, of the design features in the D'155 patent—which the Rolflex embodied—are driven by function. This finding accords with my conclusions in *Range of Motion I*, 2021 WL 3476607, at *5-6, which, although not binding, are informative because the factual record before me is essentially the same as it was in that case. And like in *Range of Motion I*, my conclusions are based primarily on a concomitant utility patent, Cross's affidavit, and Rolflex marketing materials. *See id.*

**The '081 Patent.** First, the '081 patent—embodied in the Armaid1, which ROM concedes is "the only potentially limiting prior art" (ECF No. 46 at 11)— supports finding that the overall design of the D'155 patent is functional. The '081 patent's claims, which define the scope of the protected invention, enumerate the invention's component parts and ascribes each with a utilitarian purpose, with nary a word about ornamentation to indicate either non-functional features or intended aesthetic function (*i.e.*, visual appeal). ECF No. 43-4 at 5-6. To the extent that the D'155 patent is the progeny of the '081 patent, its inheritance is purely functional.

19

**Appx19**

**The Cross Affidavit.**  The summary judgment record includes Terry Cross's affidavit [ECF No. 43-1], which also sheds light on which features of the D'155 patent are driven by functional considerations.  Cross explained the primary purpose of the Rolflex, which embodied the D'155 patent, was to allow users to massage their entire body, whereas the Rolflex's precursor, the Armaid1, massaged the arms only.  Several of the changes from the Armaid1 were functional and designed to enable this broader application, namely: (1) the overall clamshell appearance of the arms, including an increased curve of the therapy arm; (2) the inverted mushroom base; (3) the open slot at the end of the hinge apparatus, which permits the therapy arm to be removed for use as a separate tool; and (4) the oval connector pivot molded into the end of the therapy arm.

**Rolflex Marketing Material.**  Finally, ROM's marketing of the Rolflex is also relevant evidence in considering the nature of the design features in the D'155 patent.  The description of the Rolflex on ROM's website emphasizes the product's utilitarian features and the ability to use it on multiple parts of the body.  For instance, the website highlights (1) how the "clam-shaped roller arms provide significant leverage," (2) how the Rolflex's "ergonomic design enables the user to effectively self-massage over nearly every muscle of the body," and (3) how the Rolflex's "compact design . . . makes it convenient to take and use anywhere."  ECF No. 43-10 at 8.  ROM's website does not mention the ornamental aspects of the Rolflex at all.

Taking these facts together, it is evident that many of the Rolflex's individual features have a functional purpose and, thus, are beyond the scope of the claim in the D'155 patent.  In reaching this conclusion, I do not wholly exclude functional features,

20

**Appx20**

but I consider instead how those features contribute to the overall ornamentation. *See Sport Dimension*, 820 F.3d at 1322-23. To be sure, some features of the D'155 patent appear to be largely ornamental, including the hollowness and length of the handles, the thick ridged outline, the precise shape of the connector pivot, and the shape of the portion of the device where the hinge apparatus attaches to the fixed arm. But given the "design's many functional elements and its minimal ornamentation, the overall . . . scope of the claim is accordingly narrow." *Id.*; *see also Ethicon Endo-Surgery*, 796 F.3d at 1334.

ROM's arguments to the contrary are unpersuasive. At certain points during this litigation, ROM has contended that all features depicted with solid lines in the D'155 patent are necessarily ornamental because they were not disclaimed from the design, as are features drawn with dashed lines. It is unclear whether ROM maintains this position, which, in any event, is unconvincing. The Federal Circuit has repeatedly emphasized that it may be helpful to discuss which features of a design patent are driven by functional considerations. *See Egyptian Goddess*, 543 F.3d at 680. That discussion would be pointless and, indeed, impossible if every feature depicted in solid lines in design patents were *per se* ornamental.

ROM also argues that "the evidentiary questions concerning the scope of the prior art compared to the claimed design and whether the D'155 Patent's claim is primarily functional or ornamental are material questions of fact" that must be resolved in its favor at the summary judgment stage. ECF No. 46 at 11. I disagree. Although claim construction has "evidentiary underpinnings," how to construe a claim is a question of law within the exclusive province of the court. *Markman*, 517

**Appx21**

U.S. at 386, 388-90; *see also Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326-27 (2015). ROM's argument is, therefore, unavailing. Moreover, ROM has produced few—if any—facts that aid my analysis of which design features are functional. Instead, ROM relies largely on (1) the illustrations in the D'155 patent, which alone are insufficient to determine whether design features are principally functional or ornamental; and (2) the Stahl declarations, which barely address feature functionality.

Additionally, ROM seems to argue that a comparison with the prior art—the Armaid1—shows that there was a feasible alternative design for the Rolflex.[10] ROM does not develop any argument as to other alternative designs that could have achieved the same function (contrary to its approach in *Range of Motion I*). But the Cross affidavit explains that many of the changes to the Armaid1 reflected in the D'155 patent (and the Rolflex embodying it) were driven by functional considerations and the desire to make a massaging apparatus that could be used on different parts of the body. Thus, I find unavailing ROM's argument that, because the Armaid1 was an alternative design for the Rolflex, much of the design is entirely ornamental.

---

[10] ROM primarily argues that the Armaid1 provides a reasonable alternative design for the accused product—the Armaid2—and only mentions perfunctorily that the Armaid1 could provide a reasonable alternative design for the Rolflex/D'155 patent. But the latter question is what I must focus on during my claim construction because I am called on to construe the claims in the D'155 patent, not the Armaid2, and to determine whether the design features of the D'155 patent were based on function. *See Sport Dimension*, 820 F.3d at 1322 (considering whether there were reasonable alternative designs for the design patent being construed to determine whether the design features were primarily functional); *see also Lifted Ltd.*, 2020 WL 2747814, at *4 (same). ROM's focus on whether there were reasonable alternative designs for the Armaid2 is, therefore, misplaced.

**Appx22**

### (2) Infringement

#### (a) Legal Standard

"A design patent is infringed '[i]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other.'" *Ethicon Endo-Surgery*, 796 F.3d at 1335 (alteration in original) (quoting *Egyptian Goddess*, 543 F.3d at 670). This assessment must be made "in the context of the claimed design as a whole, and not in the context of separate elements in isolation." *Id.* In other words, when "the claimed design includes several elements, the fact finder must apply the ordinary observer test by comparing similarities in overall designs, not similarities of ornamental features in isolation." *Id.* "An element-by-element comparison, untethered from application of the ordinary observer inquiry to the overall design, is procedural error." *Id.* "[M]inor differences between a patented design and an accused article's design cannot, and shall not, prevent a finding of infringement." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1303 (Fed. Cir. 2010) (alteration in original) (quoting *Payless Shoesource v. Reebok Int'l Ltd.,* 998 F.3d 985, 991 (Fed. Cir. 1993)).

The ordinary-observer test comprises two steps. "First, 'where the claimed and accused designs are "sufficiently distinct" and "plainly dissimilar," the patentee does not meet its burden of proving infringement' and the Court need not resort to an analysis of the prior art." *Lanard Toys I*, 2019 WL 1304290, at *15 (quoting *High Point Design LLC v. Buyer's Direct, Inc.*, 621 Fed. App'x 632, 641 (Fed. Cir. 2015)). Second, "'[i]f the claimed and accused designs are not plainly dissimilar,' then the

analysis proceeds to the second stage to compare 'the claimed and accused designs with prior art to identify differences that are not noticeable in the abstract but would be significant to the hypothetical ordinary observer familiar with the prior art.'" *Id.* (quoting *Ethicon Endo-Surgery*, 796 F.3d at 1335).

With respect to the second step, which involves comparison with the prior art, the Federal Circuit has explained:

> [T]he ordinary observer is deemed to view the differences between the patented design and the accused product in the context of the prior art. When the differences between the claimed and accused design are viewed in light of the prior art, the attention of the hypothetical ordinary observer will be drawn to those aspects of the claimed design that differ from the prior art. And when the claimed design is close to the prior art designs, small differences between the accused design and the claimed design are likely to be important to the eye of the hypothetical ordinary observer.

*Lanard Toys II*, 958 F.3d at 1344 (quoting *Egyptian Goddess*, 543 F.3d at 676).

In conducting the ordinary-observer test, a court considers only the ornamental features of the design, including the ornamental aspects of functional features, but not the functional aspects of the design. *See Ethicon Endo-Surgery*, 796 F.3d at 1336 ("[B]ecause each of these components has a functional aspect, the underlying elements must be excluded from the scope of the design claims at this general conceptual level."); *Amini Innovation Corp. v. Anthony Cal., Inc.*, 439 F.3d 1365, 1372 (Fed. Cir. 2006) ("The trial court is correct to factor out the functional aspects of various design elements, but that discounting of functional elements must not convert the overall infringement test to an element-by-element comparison."); *see also OddzOn Prods.*, 122 F.3d at 1405 ("If . . . a design contains both functional and ornamental features, the patentee must show that the perceived similarity is based

**Appx24**

on the ornamental features of the design."). The proper way to analyze this is with a "side-by-side" comparison of the accused design and the allegedly infringed patent. *See, e.g.*, *Crocs*, 598 F.3d at 1304.

Finally, the fact that the parties or experts disagree about whether a reasonable jury could conclude that the designs are substantially similar does not preclude entry of summary judgment. *See Lanard Toys I*, 2019 WL 1304290, at *15 ("'[E]xpert testimony cannot create a material issue of fact, where [a] visual comparison reveals that the alleged infringing [design] is not substantially similar to the [patented] design.'" (alterations in original) (quoting *Dyson, Inc. v. SharkNinja Operating LLC,* No. 14-cv-779, 2018 WL 1906105, at *8 (N.D. Ill. Mar. 29, 2018)).

**(b) Application**

To determine whether the designs are substantially similar, I compare the D'155 patent and the Armaid2 side-by-side. *See Crocs*, 598 F.3d at 1304.



*Image 14 - Side-by-side comparison of the D'155 Patent and the Armaid2.*

25

**Appx25**

The D'155 patent and the Armaid2 share a "broad design concept" and "at a conceptual level they look quite similar." 2019 WL 1304290, at *15. But the rub for ROM is that most of the Armaid2's similarities to the D'155 patent are likenesses to the latter's functional features. These functional features are not protected by the D'155 patent and, therefore, do not bear on the ordinary-observer test. *See Lanard Toys II*, 958 F.3d at 1343. Accordingly, without converting the infringement analysis to an element-by-element comparison, I consider the functional features of the D'155 patent only to the extent that they contribute to the overall ornamentation. *See id.; Amini Innovation Corp.*, 439 F.3d at 1372. Looking at the overall visual impression created by the D'155 patent and the Armaid2, I conclude that they are not substantially similar, and are, in fact, plainly dissimilar.

When viewing the D'155 patent and the Armaid2 side-by-side, certain features stand out. In the D'155 patent, the hinge apparatus naturally flows into the fixed arm and would not be the ordinary observer's primary focus; instead, the fixed arm is the most noticeable feature. In contrast, the semi-rectangular hinge apparatus of the Armaid2 makes up proportionally more of the device and forms the entire base of the product, separated from the arm by a horizontal raised edge. The separation of the hinge apparatus contributes to the overall segmented appearance of the Armaid2—a difference reinforced by the presence of raised interior partitions in the clamshell arms present in the Armaid2 but absent in the D'155 patent.[11] Further, the size-selection slots in the Armaid2 are larger, both on their own and in proportion

---

[11] Although the clamshell arms themselves are functional, I must consider their ornamental aspects and the way they contribute to the overall design. *See Sport Dimension*, 820 F.3d at 1323.

to the product as a whole.  And the blunter, less rounded end of the hinge apparatus in the Armaid2 also draws the eye more than the subtler, rounder curves of the hinge apparatus in the D'155 patent.  These features contribute to the "stylized impression" conveyed by the Armaid2, as I described in *Range of Motion I*, in contrast to the "robust and workmanlike" impression conveyed by the D'155 patent. 2021 WL 3476607, at *9.  In sum, I find that the ornamental aspects of the two designs are plainly dissimilar, such that ROM cannot show patent infringement as a matter of law.  *See Ethicon Endo-Surgery*, 796 F.3d at 1335-36.

Even if I were to reach a comparison with the prior art—which I need not do given the plain dissimilarity present here, *see id*. at 1337—the prior art further supports concluding that the designs of the D'155 patent and the Armaid2 are not substantially similar.  The only relevant art acknowledged by the parties is the Armaid1.  Accordingly, I focus on the differences among the Armaid1, the D'155 patent, and the Armaid2.  *See Lanard Toys II*, 958 F.3d at 1344 ("When the differences between the claimed and accused design are viewed in light of the prior art, the attention of the hypothetical ordinary observer will be drawn to those aspects of the claimed design that differ from the prior art." (quoting *Egyptian Goddess*, 543 F.3d at 676)); *see also ABC Corp. I v. P'ship & Unincorporated Assocs. Identified on Schedule "A"*, 52 F.4th 934, 942 (Fed. Cir. 2022) ("Where a patented design and accused design are not 'plainly dissimilar,' the court must conduct a three[-]way analysis comparing the accused product, the patented design, and the prior art." (quoting *Egyptian Goddess*, 543 F.3d at 678)).

Factoring out the functional aspects of the bases (which are notably different in any event), the most salient differences between the Armaid1 and the Armaid2 are the shape of the arms and the manner in which the fixed arm connects to the hinge apparatus. With respect to arm shape, there are notable differences among the areas just below the cylindrical handlebars in all three images (though the difference is slighter between the D'155 patent and the Armaid2). But again, the hinge apparatus of the Armaid2 differs from the hinge apparatuses depicted in the D'155 patent and of the Armaid1, the latter two being quite similar to each other. Based on that holistic analysis, rather than a piecemeal, feature-by-feature comparison, I conclude that the D'155 patent and the Armaid2 are plainly dissimilar or, at the least, not substantially similar.



*Image 15 - Side-by-side comparison of D'155 Patent, the Armaid2, and the Armaid1.*

ROM's arguments to the contrary are inapposite. ROM repeatedly emphasizes the substantial differences among the claimed design, the accused product, and the prior art, such that I should construe the claims of the D'155 patent "extraordinarily

28

broadly" and conclude that the D'155 patent and the Armaid2 are substantially similar.  ECF No. 46 at 12.  But I need not reach the prior art in light of my conclusion that the ornamental aspects of the design depicted in the D'155 patent and of the Armaid2 are plainly dissimilar.  *See Ethicon Endo-Surgery*, 796 F.3d at 1337.  And although there is less prior art here than there was in *Lanard Toys I*, it is sufficient to employ that court's frame-of-reference approach—which supports concluding that the D'155 patent and the Armaid2 are not substantially similar.

Finally, although there is a genuine dispute as to whether Cross developed the Armaid2 based on the Armaid1 or the Rolflex, it is immaterial to the ultimate question I resolve in this case.  A dispute is material if it can be outcome-determinative.  *See Vineberg v. Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008).  But the linchpin of a design patent infringement claim is whether, when two products are viewed side-by-side, "an ordinary observer, familiar with the prior art, would be deceived into believing that the accused product is the same as the patented design."  *Crocs*, 598 F.3d at 1306.  Which product Cross may have used as his starting point for the Armaid2 does not bear on this inquiry such that the parties dispute over the Armaid2's inspiration, however sincere, does not preclude entry of summary judgment.

Based on the undisputed material facts, Armaid is entitled to summary judgment on ROM's infringement claim because no reasonable jury could find that the design of the Armaid2 is substantially similar to the very narrow design claimed in the D'155 patent.  *See TechSearch*, 286 F.3d at 1369.

### III. CONCLUSION

For the foregoing reasons, Armaid's Motion for Summary Judgment (ECF No. 42) is **GRANTED**.


**SO ORDERED.**

**Dated this the 28th day of August, 2023.**


                                        _____/s/ JON D. LEVY_____
                                        **CHIEF U.S. DISTRICT JUDGE**

**Appx30**



US005792081A

# United States Patent [19]

Cross

[11] **Patent Number:** 5,792,081

[45] **Date of Patent:** Aug. 11, 1998

[54] **LIMB MASSAGER**

[76] Inventor: **Terry M. Cross**, 1930 Granada Ave., San Diego. Calif. 92102

[21] Appl. No.: **544,714**

[22] Filed: **Oct. 18, 1995**

[51] Int. Cl.[6] ............................................. **A61H 15/00**

[52] U.S. Cl. ........................... **601/123**; 601/125; 601/128; 601/129; 601/131; 601/133

[58] Field of Search ................................... 601/112, 113. 601/115. 118–123. 125. 128. 129. 131. 133–137. 81. 71. 79. 111. 124. 132; 482/124. 88

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 613,859 | 11/1898 | Hickey | 601/136 |
| 1,400,547 | 12/1921 | Holmstrom | 601/125 |
| 1,933,989 | 11/1933 | McCollough | 601/136 |
| 3,465,750 | 9/1969 | Schawalder | 601/122 |
| 3,504,665 | 4/1970 | Bakunin et al. | 601/71 |
| 3,856,002 | 12/1974 | Matsumoto | 128/67 |
| 4,191,177 | 3/1980 | Abbott | 601/125 |
| 5,195,510 | 3/1993 | Svacina | 128/61 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 140735 | 2/1935 | Austria | 601/133 |
| 0346942B1 | 8/1984 | European Pat. Off. . | |
| 1149974 | 4/1985 | U.S.S.R. | 601/125 |
| 1528489 | 7/1986 | U.S.S.R. . | |
| 1711886A1 | 11/1988 | U.S.S.R. . | |
| 2990 | 8/1908 | United Kingdom | 601/133 |
| 2127297 | 4/1984 | United Kingdom . | |

*Primary Examiner*—Danton D. DeMille
*Attorney, Agent, or Firm*—Henri J. A. Charmasson; John D. Buchaca

[57] **ABSTRACT**

A self-operated apparatus particularly adapted for massaging a user's wrist and forearm affected by repetitive strain injuries such as carpal tunnel syndrome comprises two clamping arms hingedly joined at one end and provided with cooperating handles at the other ends. Rollers and balls are mounted on opposite median sections of the arms. The hinged ends of the arms are universally attached to a support that can be strapped over the user's thigh, whereby an arm can be adjustably clamped between the sets of rollers and balls by bringing the two handles together and the arm and wrist massaged by translating and rotating movements of the arm along an axis perpendicular to the mounting axes of the rollers and balls.

**13 Claims, 2 Drawing Sheets**



Case: 23-2427    Document: 19    Page: 80    Filed: 12/22/2023



FIG. 4

FIG. 3

FIG. 2

FIG. 1

FIG. 5



FIG. 6

FIG. 7

FIG. 8

FIG. 9

5,792,081

1

# LIMB MASSAGER

## SUMMARY OF THE INVENTION

This invention relates to body massaging devices and more particularly to devices adapted for the treatment of wrists and arms affected by carpal tunnel syndrome.

## BACKGROUND OF THE INVENTION

This invention is a result of a search for a self-operated massaging device for the preventive as well as remedial treatment of wrist and lower arm ailments.

Most self-operated massaging devices are hand-held massagers that do not provide for any stabilizing support and therefore cannot apply any substantial amount of controllable therapeutic pressure on the ailing muscle or tendon. Other automatic massaging devices driven by electric motors are not capable of reacting to a sudden pain felt by the user, and, therefore can inflict a great deal of unnecessary suffering before the user can turn off the device as the massaging heads reach a particular sensitive spot.

There is a need for a simple and inexpensive, yet effective limb-massager which although hand-operated can be firmly stabilized and applied under the user's own motions without risk of inflicting undue pain or discomfort.

## SUMMARY OF THE INVENTION

The principal and secondary objects of this invention are to provide a hand-operated, limb-massaging instrument for the preventive or remedial treatment of muscular disorders and more specifically for the treatment of repetitive strain injuries such as carpal tunnel syndrome; in the form of a simple, yet efficient device that allows for stable and easily controllable application of rolling pressure to the affected area.

These and other valuable objects are achieved by a device consisting of two clamping arms hingedly joined about a support structure that can be secured to one of the user's thighs. Rollers installed in a face-to-face arrangement in median sections of the clamping arms can be adjustably brought to work against the lower arm and wrist while the free upper ends of the arms are held together with the user's free hand. The device compresses the limb from opposite sides to enhance blood and lymph circulation through muscle tissue. The relaxing effect on connective tissue allows for a greater range of muscular motion.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a front elevational view of the limb-massaging apparatus;

FIG. 2 is a top plan view thereof;

FIG. 3 is a side view of a first alternate embodiment of the massaging member;

FIG. 4 is a side view of a second alternate embodiment of the massaging member;

FIG. 5 is a cross-sectional view of the second alternate embodiment of the massaging member;

FIG. 6 is a front view of a first alternate embodiment of the support base;

FIG. 7 is a front view of a second alternate embodiment of the support base;

FIG. 8 is a partial perspective view of a second embodiment of the limb-massaging apparatus; and

FIG. 9 is an illustration of a limb-massaging method.

2

## DESCRIPTION OF THE PREFERRED EMBODIMENTS OF THE INVENTION

Referring now to the drawing, there is shown in FIGS. 1 and 2 a first embodiment 1 of a limb-massaging apparatus according to the invention. The apparatus comprises a first arm 2 and a second arm 3 hingedly connected at their lower ends 4 and 5. The lower end 4 of the first arm is also connected by a ball-and-socket assembly 6 to a support structure 7. The first arm 2 has a massaging member consisting of a roller 8 rotatively mounted on a median section of the first arm around a shaft 9 spanning two distant anchor points 10 and 11 bored into the side of a cutout section 12 in the inner side 13 of the first arm 2 facing the second arm 3. At the upper end of the first arm, a handle 14 is mounted perpendicularly to the arm and parallelly to the rotating axis of the second arm 3 in relation to the first arm. The lower end of the first arm defines an adjustable hinge 15 with the lower extremity 5 of the second arm 3. The hinge assembly 15 not unlike those found in adjustable pliers, provides a row 16 of four circular-bearing positions for the connecting pin 17 associated with the second arm. The pin 17 has been flattened on opposite sides so that it may be passed through the narrowed channels 18 connecting the circular-bearings. A cutout 19 in a median section of the second arm 3 facing the first arm, defines spaced-apart anchor points 20 and 21 for a resiliently flexible shaft 22 upon which are strung spherical rollers of balls 24–26 separated by bead-spacers 27. The resiliently flexible shaft 22 can be made from a section of piano cord, whalebone, or steel wire, preferably covered with a plastic sleeve for smoother and quieter operation. The balls 24–26 and the roller 8 can be made of plastic or rubber with their surface preferably covered with a synthetic foam material for painless contact with the skin of the user. A second handle 28 symmetrical to the first handle 14 is mounted at the upper extremity of the second arm.

The ball-and-socket assembly joining the lower end 4 of the first arm to the support structure 7 comprises a conical tendon 29 welded to a ball 30, and a socket 31 having a first upper half 32 defining a cavity shaped and dimensioned to capture slightly more than one-half of the ball 30 and a lower half 33 screwed into the first half 32 and secured to the support structure 7. A resiliently compressible bearing 34 made of nylon, neoprene or other similar material is inserted between the two halves 32, 33 of the socket to provide limited friction between the ball 30 and the cavity of the socket 31.

The support structure 7 comprises an arcuate footing 35 shaped to rest comfortably on the leg of a user, and a strap 36 attached at one end to the arcuate footing 35 and engaging a ring 37 mounted at the opposite end of the arcuate footing 35. The strap has cooperating loops-and-vanes cloth fastening patches 38 and 39 so that it can be conveniently wrapped around a thigh of the user to secure the supporting structure 7.

It should be understood that the rollers forming one of the massaging members can have a variety of contact surface configurations such as the one 40 illustrated in FIG. 3 that comprises a plurality of bead-like formations 41.

An alternate embodiment 42 of the spherical roller massaging member assembly 42 is illustrated in FIGS. 4 and 5. Instead of being strung on an arcuate flexible shaft, each spherical roller 43–45 is captured in its separate cavity 46–48 and backed by a coil-spring 49–51.

In lieu of the strap 36, a resilient circular clamp 52 may be used to secure the footing 7 as shown in FIG. 6 over the thigh of the user.

5,792,081

| 3 | 4 |

Another alternate embodiment of the support structure is shown in FIG. 7. In this case, the ball-and-socket assembly 6 is mounted on a generally S-shaped bracket 53 forming a first arch 54 shaped and dimensioned to rest on the upper portion of one of the user's thighs, and a second, inversely-oriented arch 55 shaped and dimensioned to be immobilized between the lower portion of the other thigh of the user and a sitting surface.

In an alternate embodiment of the limb-massaging apparatus shown in FIG. 8, the support structure has been replaced by a third handle 56 not unlike the first and second handles 14 and 28.

The limb-massaging apparatus is especially adapted for use by a patient on his own wrist and arm affected by carpal tunnel syndrome. FIG. 9 illustrates one way among many others of using the apparatus for such a purpose.

With the support structure 7 securely fastened around the hip 57 of the user, the wrist and arm 58 to be massaged can be captured between the two arms 2 and 3 at the level of their massaging members by the user grabbing with his free hand the two upper handles 14 and 28 and bringing them together until the massaging elements come into contact with the ailing wrist. The arm and wrist can then be moved in either a translating movement perpendicular to the axes of the massaging elements as indicated by arrow 59, or moved in a alternating rotating movement as indicated by arrow 60, or a combination of both types of motions. Due to the resilient mounting and surface coating of the massaging elements, the contact pressure against the ailing limb is automatically regulated. At all times the user remains in full control of the applied massaging pressure which he can release instantly upon sensing any pain or discomfort. This instant feedback offers a substantial advantage over automatic massaging devices.

The three-handle embodiment of the limb-massaging apparatus illustrated in FIG. 8 is particularly adapted for self-use on an ankle or calf. The user, in this case, translates the apparatus along the stationary limb by holding the lower handle 56 with one hand while adjustably holding the two upper handles 14 and 28 with the other hand.

While the preferred embodiments of the invention have been described, modifications can be made and other embodiments may be devised without departing from the spirit of the invention and the scope of the appended claims.

What is claimed is:

1. A limb-massaging apparatus which comprises:

a first arm having first and second ends;

a first massaging member rotatively mounted in a median section of said first arm;

a first handle mounted on said first end; and

a holding structure secured to the second end of said first arm;

wherein said holding structure comprises:

a footing having an arcuate base; and

a strap adjustably securable to opposite sides of said arcuate base and being sized to wrap around the leg of an operator.

2. The apparatus of claim 1, which further comprises:

means for articulately joining said footing to the second end of said first arm.

3. The apparatus of claim 2, wherein said means for articulately joining comprise a ball joint.

4. The apparatus of claim 1, which further comprises:

a second arm having first and second extremities;

a second handle mounted on said first extremity;

means for hingedly attaching said second extremity to the first arm;

a second massaging member mounted on a median section of said second arm; and

wherein said first and second arms and said massaging members are shaped and dimensioned to adjustably clamp a limb between said first and second massaging members when said first and second handles are brought and held together.

5. The apparatus of claim 4, wherein one of said first and second massaging members comprise:

a resiliently flexible first shaft arcuately spanning two distant anchor points on one of said arms; and

a plurality of rolling elements rotatively mounted on over said first shaft.

6. The apparatus of claim 5, wherein another of said first and second massaging members comprise:

a second shaft spanning two distant spaced-apart anchor points on another of said arms; and

an elongated roller rotatively mounted on said second shaft.

7. The apparatus of claim 1, wherein said first massaging member comprises at least one spherical roller.

8. The apparatus of claim 1, wherein said first massaging member comprises:

at least one ball; and

resiliently compressible means for rotatively mounting said ball.

9. The apparatus of claim 1, wherein said holding structure further comprises a third handle secured to said second end of said first arm.

10. A limb-massaging apparatus which comprises:

a first arm having first and second ends;

a first massaging member mounted in a median section of said first arm;

a first handle mounted on said first end;

a second arm having first and second extremities;

a second handle mounted on said first extremity;

means for hingedly attaching said second extremity to the first arm;

a second massaging member mounted on a median section of said second arm; and

a holding structure secured to the second end of said first arm;

wherein said first and second arms and said massaging members are shaped and dimensioned to adjustably clamp a limb between said first and second massaging members when said first and second handles are brought and held together;

wherein said holding structure comprises:

a footing having an arcuate base;

a strap adjustably securable to opposite sides of said arcuate base and being sized to wrap around the thigh of an operator; and

means for mounting the second end of said first arm on said footing.

11. The apparatus of claim 10, wherein said means for mounting comprise a ball joint.

12. A limb-massaging apparatus which comprises:

a first arm having first and second ends;

a first massaging member mounted in a median section of said first arm;

a first handle mounted on said first end;

5,792,081

5

a second arm having first and second extremities;

a second handle mounted on said first extremity;

means for hingedly attaching said second extremity to the first arm;

a second massaging member mounted on a median section of said second arm; and

a holding structure secured to the second end of said first arm;

wherein said first and second arms and said massaging members are shaped and dimensioned to adjustably clamp a limb between said first and second massaging members when said first and second handles are brought and held together;

wherein said holding structure comprises:

    a resilient clamp shaped to surround the thigh of an operator; and

    a ball-joint securing said clamp to the second end of said first arm.

13. A limb-massaging apparatus which comprises:

a first arm having first and second ends;

a first massaging member mounted in a median section of said first arm;

6

a first handle mounted on said first end;

a second arm having first and second extremities;

a second handle mounted on said first extremity;

means for hingedly attaching said second extremity to the first arm;

a second massaging member mounted on a median section of said second arm; and

a holding structure secured to the second end of said first arm;

wherein said first and second arms and said massaging members are shaped and dimensioned to adjustably clamp a limb between said first and second massaging members when said first and second handles are brought and held together;

wherein said holding structure comprises:

    an arcuate bracket generally S-shaped and dimensioned to wrap over a portion of a user's thigh and under another thigh; and,

    means for articulately joining said bracket to the second end of said first arm.

\*   \*   \*   \*   \*

Appx36



US00D802155S

(12) **United States Design Patent**     (10) Patent No.:     **US D802,155 S**
Cross                                      (45) Date of Patent:     ** **Nov. 7, 2017**

(54) **BODY MASSAGING APPARATUS**

(71) Applicant: **RANGE OF MOTION PRODUCTS, LLC**, Rancho Santa Fe, CA (US)

(72) Inventor: **Terry Cross**, Blue Hill, ME (US)

(73) Assignee: **RANGE OF MOTION PRODUCTS, LLC**, Rancho Santa Fe, CA (US)

(**) Term: **15 Years**

(21) Appl. No.: **29/565,887**

(22) Filed: **May 25, 2016**

(51) LOC (10) Cl. .............................................. **28-03**
(52) U.S. Cl.
      USPC ...................................................... **D24/211**
(58) **Field of Classification Search**
      USPC .............. D24/200, 211, 212, 213, 214, 215;
               601/19, 27–32, 46–48, 52, 99, 112–113,
               601/118, 135, 137, DIG. 12, DIG. 14,
               601/DIG. 15, DIG. 16, DIG. 17; D30/160
      CPC ........ A61H 19/00; A61H 19/30; A61H 19/32;
               A61H 19/34; A61H 19/40; A61H 19/44;
               A61H 19/50; A61H 2015/0007; A61H
               2015/0014; A61H 2015/0042; A61H
               15/00; A61H 7/003; A61H 7/005
      See application file for complete search history.

(56)                **References Cited**

               U.S. PATENT DOCUMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| D261,428 | S | * | 10/1981 | Noble | ........................ | D24/211 |
| D354,571 | S | * | 1/1995 | Monti | ........................ | D24/215 |
| D371,443 | S | * | 7/1996 | Lie | ........................ | D24/211 |
| D384,161 | S | * | 9/1997 | Tseng | ........................ | D24/211 |
| 5,730,708 | A | | 3/1998 | Spratt | | |
| D395,088 | S | * | 6/1998 | Wiggs, Sr. | ........................ | D24/211 |
| D396,111 | S | * | 7/1998 | Chien | ........................ | D24/211 |
| D396,295 | S | * | 7/1998 | Summers | ........................ | D24/211 |
| D396,297 | S | * | 7/1998 | Breznik | ........................ | D24/211 |
| 5,792,081 | A | | 8/1998 | Cross | | |
| D405,887 | S | * | 2/1999 | Antoskow | ........................ | D24/211 |
| D405,888 | S | * | 2/1999 | Antoskow | ........................ | D24/211 |
| D408,081 | S | * | 4/1999 | Chen | ........................ | D24/211 |
| D437,939 | S | * | 2/2001 | Hirosawa | ........................ | D24/214 |

               (Continued)

               FOREIGN PATENT DOCUMENTS

WO          2013/070632 A1      5/2013

               OTHER PUBLICATIONS

International Search Report & Written Opinion for PCT/US16/26836 dated Aug. 18, 2016; 6 pages.

*Primary Examiner* — Sandra Snapp
(74) *Attorney, Agent, or Firm* — Loza & Loza, LLP; Heidi L. Eisenhut

(57)                **CLAIM**

The ornamental design for a body massaging apparatus, as shown and described.

               **DESCRIPTION**

FIG. **1** is a top left perspective view of a first side body massaging apparatus according to the present invention;
FIG. **2** is a bottom right perspective view of a second side of the body massaging apparatus of FIG. **1**;
FIG. **3** is a first side elevation of the body massaging apparatus of FIG. **1**;
FIG. **4** is a second side elevation of the body massaging apparatus of FIG. **1**;
FIG. **5** is a back elevation view of the body massaging apparatus of FIG. **1**;
FIG. **6** is a front elevation view of the body massaging apparatus of FIG. **1**;
FIG. **7** is a top plan view of the body massaging apparatus of FIG. **1**; and,
FIG. **8** is a bottom plan view of the body massaging apparatus of FIG. **1**.
Dashed lines indicate material disclaimed from the invention and are for purposes of illustration only.

               **1 Claim, 7 Drawing Sheets**



**Appx37**

**US D802,155 S**

Page 2

(56)    **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| D491,271 | S | * | 6/2004 | Siegfried | D24/211 |
| D646,793 | S | * | 10/2011 | Wagner | D24/211 |
| D688,380 | S | * | 8/2013 | Nelson | D24/211 |
| D697,220 | S | * | 1/2014 | Clementes | D24/211 |
| D699,366 | S | * | 2/2014 | Marshall | D24/215 |
| D727,526 | S | * | 4/2015 | Mercado Diaz | D24/215 |
| 9,622,937 | B2 | * | 4/2017 | Nelson | A61H 15/0092 |
| 2011/0137218 | A1 | | 6/2011 | Collins | |
| 2013/0289454 | A1 | | 10/2013 | Wang et al. | |

* cited by examiner

**Appx38**

*FIG. 1*





FIG. 2



*FIG. 3*



*FIG. 4*



*FIG. 5*



FIG. 6

*FIG. 7*



*FIG. 8*



UNITED STATE DISTRICT COURT
DISTRICT OF MAINE

RANGE OF MOTION PRODUCTS LLC,          )
                                                                          )
                                                                          )
              Plaintiff,                                              )
                                                                          )
v.                                                                        )          No. 1:22-cv-00091-JDL
                                                                          )
                                                                          )
THE ARMAID COMPANY INC.,              )
                                                                          )
              Defendant.                                          )

**Plaintiff's Infringement Contentions**

Pursuant to the Amended Scheduling Order (ECF No. 33), Plaintiff, Range of Motion

Products LLC, ("RoM") hereby serves the Defendant, The Armaid Company Inc., with the

following Infringement Contentions.

RoM asserts that Defendant is infringing RoM's Design Patent No. D802,155, which

claims the design for a body massaging apparatus (the "D'155 Patent"). A true and accurate copy

of the D'155 Patent is attached hereto as **Exhibit 1**. Defendant is infringing the D'155 Patent by

marketing and selling the Armaid 2 massage device on its website (the "Armaid 2"). *See* 35 U.S.C.

§271(a)(prohibiting the unauthorized offer for sale or sale of patented products). A claim chart

comparing exemplary drawings from the D'155 Patent to the design for the Armaid 2 is attached

hereto as **Exhibit 2**.

"Determining whether a design patent has been infringed is a two-part test: (1) the court first

construes the claim to determine its meaning and scope; (2) the fact finder then compares the properly

construed claim to the accused design." *Lanard Toys Limited v. Dolgencorp LLC,* 958 F.3d 1337, 1341

(Fed. Cir. 2020). Design patents are typically claimed as shown in the drawings; however, since

design patents only protect the ornamental features (i.e., the appearance) of a product, the Court

1

**Appx46**

may find it necessary to "distinguish between those features of the claimed design that are ornamental and those that are purely functional." *Lanard Toys,* 958 F.3d at 1342. This issue is properly resolved during claim construction. *See Egyptian Goddess, Inc. v. Swisa, Inc.,* 543 F.3d 665, 679 (Fed. Cir. 2008)(en banc); *Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314, 1319 (Fed. Cir. 2007); *L.A. Gear, Inc., v. Thom McAn Shoe Co.,* 968, F.2d 1117, 1123 (Fed. Cir. 1993).

When comparing the patented and accused device's design, the accused device's design should be found infringing if "in the eye of an ordinary observer, giving such attention as a purchaser usually gives, [the] two designs are substantially the same," meaning "the resemblance [between the accused device's design and the design patent is likely to] deceive such an observer, inducing him to purchase one supposing it to be the other." *Egyptian Goddess,* 543 F.3d at 670. RoM asserts that the properly construed claim of the D'155 Patent is the overall appearance of the body massaging apparatus shown in Figures 1-8 thereof. *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.,* 796 F.3d 1312, 1335 (Fed. Cir. 2015)(stating that the "ordinary observer" test for infringement of a design patent requires the Court, acting as the finder of fact, to "compare similarities in overall designs, not similarities of ornamental features in isolation"). The only features that should be excluded from the scope of design patent coverage here are the roller attachments drawn in dashed lines, as these have been explicitly disclaimed by the description of the D'155 Patent.

When comparing this properly construed design patent claim to the design for the Armaid 2, as shown in **Exhibit 2**, it is apparent that the Armaid 2 infringes the D'155 Patent because their overall designs are similar enough to deceive consumers into purchasing the Armaid 2 believing it to have the product design illustrated in Figures 1-8 of the D'155 Patent. As a supplement to RoM's claim chart, the following is a comparison of a side view illustrated in Figure 3 of the D'155 Patent overlaying an image of the Armaid 2:

2

**Appx47**



Without reducing the "ordinary observer" test to an element-by-element comparison, it is particularly striking that a majority of the design for the Armaid 2 is either identical or practically identical to the design claimed in the D'155 Patent. Particularly, the exact shape of the arms, the ridged texture on the top of the arms, and the notches on the base for both designs have the exact same overall appearance. The only real differences between the two designs are that the Armaid 2 has five notches instead of the six notches claimed in the D'155 Patent and that the silicone or rubber base at the very bottom of the Armaid 2 is concave instead of convex. These are insubstantial differences to the eye of the ordinary observer.

3

Thus, these designs are substantially similar, and RoM asserts that Defendant is infringing the D'155 Patent through its marketing and sale of the Armaid 2.

Respectfully submitted,

Attorneys for Plaintiff
**Range of Motion, LLC**

Dated: November 18, 2022

/s/ Brendan M. Shortell
Brendan M. Shortell, Esq. (PHV)
Gary E. Lambert, Esq.
Maine Bar No. 006606

Lambert Shortell & Connaughton
100 Franklin Street, Suite 903
Boston, MA 02110
Main: (617)-720-0091
shortell@lambertpatentlaw.com

## CERTIFICATE OF SERVICE

I, Brendan M. Shortell, certify that a true and accurate copy of the foregoing document was filed through the Court's ECF system on November 18, 2022.

**Appx49**







FIG. 7

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| RANGE OF MOTION PRODUCTS LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:22-cv-00091-JDL |
| | ) | |
| | ) | |
| THE ARMAID COMPANY INC., | ) | |
| | ) | |
| Defendant. | ) | |

**Joint List of Proposed Claim Constructions and Citations to Evidence**

Pursuant to the Amended Scheduling Order (ECF No. 33) Plaintiff, Range of Motion Products LLC ("RoM"), and Defendant, The Armaid Company Inc. ("Armaid"), hereby submit their joint statement of proposed claim constructions and evidentiary citations supporting said constructions for United States Patent No. D802,155 S ("D'155 Patent").

1

**Appx53**

**Proposed Claim Constructions For The D'155 Patent**

| RoM's Construction | RoM's Supporting Evidence | RoM's Rebuttal Evidence | Armaid's Construction | Armaid's Supporting Evidence | Armaid's Rebuttal Evidence |
|---|---|---|---|---|---|
| The ornamental design for a body massaging apparatus, as shown in Figs. 1-8, excluding only the material depicted in dashed lines. The material depicted in solid lines is ornamental and not dictated by the function of the body massaging apparatus. | • D'155 Patent (Ex. 1)<br><br>• Armaid1 (Ex. 2)<br><br>• Ex. 1, 1: "The *ornamental design* for a body massaging apparatus, as shown and described." (emphasis added).<br><br>• Ex. 1, 1: "Dashed lines indicate material disclaimed from the invention and are for purposes of illustration only."<br><br>• *Compare* Exs. 1 and 2:<br><br>The Armaid1 is both prior art providing boundaries for the scope of the present claim and evidence of possible alternative designs for certain features shown in the D'155 Patent. | • *See* RoM's Supporting Evidence.<br>• RoM's proposed construction is consistent with RoM's infringement contentions. *See* ECF 43-14 at 2.<br>• RoM may need to rely on expert testimony on the limited question of the availability of alternative designs for the D'155 Patent. This expert testimony would only be necessary if Armaid claims the D'155 Patent's design is primarily functional. In other words, RoM would not be relying on expert testimony to advance its own position, but rather to counter specific assertions that Armaid may make during claim construction. | **Proposed construction:**<br><br>Plain meaning.<br><br>**Objections to RoM's proposed construction:**<br><br>RoM's proposed construction is inconsistent with RoM's infringement contentions. See ECF 43-14 at 2.<br><br>RoM did not timely disclose any expert, and so may not rely on expert testimony. *See* ECF 14 at 2.<br><br>RoM did not timely serve evidence in support of its construction on Armaid, *see* ECF 33 at 1, and so may not rely on evidence not timely identified. | D'155 Patent (Ex. 1), Claim; Description; Figs. 1-8. | "The ornamental design for a body massaging apparatus, as shown in Figs. 1-8…"<br><br>This statement is incomplete. *See* D'155 Patent, Claim ("The ornamental design for a body massaging apparatus, as shown and described.").<br><br>"excluding only the material depicted in dashed lines:"<br><br>The intrinsic evidence does not support the assertion that *only* the material in dashed lines is excluded from the claim. *See* D'155 Patent, Description ("Dashed lines indicate material disclaimed from the invention and are for purposes of illustration only.").<br><br>The extrinsic evidence does not support this assertion. *See* ECF 43 ¶¶ 1-38, ECF 43-1 to 43-15.<br><br>"the material depicted in solid lines is ornamental and not dictated by the function of the body massaging apparatus:"<br><br>The intrinsic evidence does not support this statement. |

2

**Appx54**

| RoM's Construction | RoM's Supporting Evidence | RoM's Rebuttal Evidence | Armaid's Construction | Armaid's Supporting Evidence | Armaid's Rebuttal Evidence |
|---|---|---|---|---|---|
| | | • RoM's evidence in support of its construction is only the intrinsic evidence found in the D'155 Patent and the prior art design of the Armaid1, both of which were readily available to Armaid before exchange of the parties' claim construction positions.<br>• To the extent that Armaid maintains that the design claimed in the D'155 Patent is primarily functional, RoM maintains that "[t]he material depicted in solid lines is ornamental and not dictated by the function of the body massaging apparatus." | RoM's proposed construction improperly introduces a conclusion of law regarding the validity of the claim of the D'155 Patent into its construction. | | *See* D'155 Patent, Claim; Description; figs. 1-8.<br><br>The extrinsic evidence does not support this statement. *See* ECF 43 ¶¶ 1-38, ECF 43-1 to 43-15. |

3

**Appx55**

Respectfully submitted,
Attorneys for Plaintiff
**Range of Motion, LLC**

Dated: January 31, 2023

/s/ Brendan M. Shortell
Brendan M. Shortell, Esq. (PHV)
shortell@lambertpatentlaw.com


/s/ Justin P. Tinger
Justin P. Tinger, Esq. (PHV)
tinger@lambertpatentlaw.com


Gary E. Lambert, Esq.
Maine Bar No. 006606
Lambert Shortell & Connaughton
100 Franklin Street, Suite 903
Boston, MA 02110
Main: (617)-720-0091

Attorneys for Defendant
**The Armaid Company, Inc.**

*/s/ David Swetnam-Burland*
Peter J. Brann
Stacy O. Stitham
David Swetnam-Burland
Brann & Isaacson
113 Lisbon St., P.O. Box 3070
Lewiston, ME 04243-3070
(207) 786-3566
pbrann@brannlaw.com
sstitham@brannlaw.com
dsb@brannlaw.com

4

**Appx56**

**<u>CERTIFICATE OF SERVICE</u>**

I, Brendan M. Shortell, certify that a true and accurate copy of the foregoing document

was filed through the Court's ECF system on January 31, 2023.


<u>/s/ Brendan M. Shortell</u>
Brendan M. Shortell

5

**Appx57**

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 20, 2023, I electronically filed the foregoing Corrected Brief of the Plaintiff-Appellant with the United States Court of Appeals for the Federal Circuit by using the CM/ECF system. I certify that counsel of record are registered as ECF filers and that they will be served by the CM/ECF system on:

Brendan M. Shortell
Email: shortell@lambertpatentlaw.com
David J. Connaughton, Jr.
Email: connaughton@lambertpatentlaw.com
Justin P. Tinger
Email: tinger@lambertpatentlaw.com
Lambert, Shortell & Connaughton
100 Franklin Street, Suite 903
Boston, MA 02110
Phone: (617) 720-0091

Peter J. Brann
Email: pbrann@brannlaw.com
Stacy Stitham
Email: sstitham@brannlaw.com
David Swetnam-Burland
Email: dsb@brannlaw.com
Brann & Isaacson
113 Lisbon Street, PO Box 3070
Lewiston, ME 04243-3070
Phone: (207) 786-3566

/s/ Brendan M. Shortell
BRENDAN M. SHORTELL

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because: (1) this brief contains 8,902 words; and (2) this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14 point proportionally spaced Times New Roman font.

/s/ Brendan M. Shortell
BRENDAN M. SHORTELL